2020 IL App (1st) 172390
Opinion filed August 6, 2020

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 92 CR 27511 |
| | ) | |
| JUAN FIGUEROA, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Juan Figueroa, appeals an order of the circuit court denying him leave to file a successive postconviction petition challenging the 75-year sentence he received for a murder he committed at the age of 17. He contends that the sentence is a *de facto* life sentence that is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), because it was imposed without adequate consideration of his youth and its attendant characteristics. The State counters that defendant's sentence is not a *de facto* life sentence because he is eligible to receive day-for-day good-conduct credit that may entitle him to release after 37.5 years. Alternatively, the State argues

that defendant's sentence comports with *Miller* because the trial court considered his youth and its attendant characteristics before imposing the sentence. For the following reasons, we reverse the circuit court's order, vacate defendant's sentence, and remand for a new sentencing hearing.[1]

¶ 2                                 I. BACKGROUND

¶ 3     In July 1992, at the age of 17, defendant participated with his father and another man in the armed robbery and murder of Aldemar Perez. At trial, the State relied primarily on defendant's custodial statements. In the statements, defendant explained that he overheard his father and a man named Daniel Aponte discussing a plan to steal drugs and money from the victim. Defendant asked his father to include him in the plan because he needed money. The plan called for defendant, his father, and a man named Francisco Perez to lure the victim to Francisco's garage under the guise of buying his van. Once there, they would rob the victim and take the keys to his apartment.

¶ 4     On the day in question, defendant, his father, and Francisco drove to the victim's place of business, and defendant's father and Francisco went inside. A short time later, defendant's father and Francisco emerged with the victim, and the three men and defendant got into the victim's van. Francisco drove the van to his garage, where he told the victim that he had air compressors that he wanted to sell him. Defendant's father and Francisco entered the garage with the victim, while defendant waited outside.

¶ 5     As he stood outside, defendant heard the sound of someone being hit and a scream coming from inside the garage. Defendant then entered the garage and saw the victim lying face down on the floor, with defendant's father and Francisco kneeling over him. Defendant's father had a

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

hammer in his hand, and the victim had blood on his head and face. Defendant saw the victim struggling, so he held down the victim's legs. Francisco then took the hammer from defendant's father and used it to hit the victim on the head about 20 times. When the victim continued to struggle, defendant hit him twice on the legs and back with a two-by-four piece of wood. Defendant then tied the victim's hands and feet with electrical cord. With the victim still struggling, defendant hit him with a tire iron. (The detective who took defendant's initial oral statement testified that defendant stated that he hit the victim in the head with the tire iron. In a statement memorialized in writing by an assistant state's attorney, defendant stated that he hit the victim in the back and stomach.) Francisco then wrapped the victim's mouth with tape.

¶ 6     Defendant's father took the victim's apartment keys, and defendant took the victim's wallet. Defendant's father then told defendant to leave the garage and wait outside. Several minutes later, defendant's father and Francisco exited the garage, and the trio drove to Aponte's house, where they cleaned up and discarded their blood-soaked clothing. The next day, defendant, his father, and Aponte went to the victim's apartment and stole jewelry, cocaine, and $50,000 in cash. Aponte gave defendant $500 and some of the cocaine. While at the apartment, defendant heard his father and Aponte discussing how to dispose of the victim's body. Police later found the victim's body in an alley, wrapped in a tarp, with his eyes, nose, and mouth covered with tape and his arms and legs tied together behind his back. The medical examiner testified that the victim suffered injuries to his body consistent with blunt force trauma and that he died of suffocation, with strangulation as a contributing factor.

¶ 7     The jury found defendant guilty of first degree murder and armed robbery. The sentencing range for first degree murder was 20 to 60 years in prison. See 730 ILCS 5/5-8-1(a)(1) (West

1992). However, the trial court could impose an extended-term sentence of up to 100 years in prison, or a sentence of natural life imprisonment, if it found that the offense "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-5-3.2(b)(2), 5-8-1(a)(1)(b), 5-8-2(a)(1) (West 1992). The trial court could also impose a natural life sentence if it found one of several other aggravating factors, including that "the defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder," or that "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 730 ILCS 5/5-8-1(a)(1)(b), 9-1(b)(5), (11) (West 1992).[2]

¶ 8     At the sentencing hearing, the trial court considered a presentence investigation report (PSI) prepared by the probation department. The PSI noted that defendant was born in Puerto Rico and moved to Chicago at the age of one. His parents had been married for 25 years, and he had one older sister. He described his childhood as good and stated that he had a close relationship with his parents and sister. He denied being abused or neglected, but he stated that he was left blind in one eye after being hit with a tile at the age of four. He admitted to being a member of the Latin Disciples street gang and stated that he joined the gang at the age of 11. He dropped out of school after the tenth grade, but prior to dropping out, he had been a member of the swim team

---

[2] Because defendant was under the age of 18 at the time of the offense, he was ineligible for a sentence of death. See 720 ILCS 5/9-1(b) (West 1992).

and received average grades. He reported having worked as a grocery store bagger between the ages of 9 and 11 and in construction with his father from the age of 11 until his arrest in this case.

¶ 9 The PSI also documented defendant's history of juvenile delinquency adjudications and adult criminal convictions. In February 1991, he was adjudicated delinquent for committing a robbery and was sentenced to probation. The probation was terminated "without designation" in September 1991, when defendant was adjudicated delinquent for committing a burglary. He was sentenced to a new term of probation for that offense, which was terminated unsatisfactorily in April 1992. In February 1992, defendant was convicted of burglary and was sentenced to 18 months of probation. In March 1992, he was convicted of committing another burglary and was sentenced to a concurrent two-year term of probation.

¶ 10 Defendant's sister and cousin testified at the sentencing hearing. Defendant's sister testified that she and defendant had a close relationship. She testified that defendant had never acted violently toward her and that she had never seen him act violently toward others. Defendant's cousin testified that she used to live with defendant's family and that she too had a good relationship with defendant. She also testified that defendant had never acted violently toward her and that she had never seen him act violently toward others.

¶ 11 Defense counsel asked the court to impose a sentence near the lower end of the sentencing range, suggesting a term between 20 and 30 years in prison. Counsel urged the court to consider defendant's "young age," arguing that defendant was "impressionable" and had been negatively influenced by his father. Counsel described defendant's involvement in the robbery and murder as "minimal" and stressed that defendant did not plan the crimes but instead "went along" with his father, who was "supposed to be teaching him right from wrong." Counsel noted that defendant

had not previously been convicted of any crime of violence and that he had a consistent work history and some education. Counsel urged the court not to "send[ ] [defendant] away forever," arguing that defendant was "salvageable" and could become "a productive member of society."

¶ 12    The prosecutor asked the court to impose a natural life sentence. She stressed the brutal and heinous nature of the crime and the victim's "slow torturous death." She also argued that the murder had been committed in a cold, calculated, and premeditated manner and that defendant had been motivated "solely by greed." She also noted that defendant was on probation for two prior burglary convictions at the time of the offense. Finally, she argued that defendant had not been "led into this crime unwittingly by [his] father" but had instead "volunteered his actions" and "was in from the planning stage."

¶ 13    After indicating that it had considered the PSI and the aggravating and mitigating factors discussed by the parties, the trial court imposed an extended-term sentence of 75 years in prison. The court determined that defendant was eligible for either a natural life sentence or an extended-term sentence because his actions during the course of the murder were "brutal and heinous" and because he committed the murder for personal gain. The court also noted that, while defendant's prior adult convictions did not involve crimes of violence, they constituted "serious offenses." The court then explained why a 75-year sentence was "the only just sentence in this case":

> "The facts as I listened to the evidence that was put forth by the State during the course of trial show a person who has no or who puts no value on human life whatsoever, a person who is ruthless, cold, calculated[,] and *** savage. To be involved in and participate in acts such as this [is] unconscionable and beyond comprehension. It is one of the worse if not worst factual situations I have seen in

my nine years in this building and in my 18 or so years involved in the criminal justice system. But for his age, [defendant] would be receiving a sentence of natural life imprisonment."

¶ 14    On direct appeal, defendant argued that the trial court erred in allowing the State to introduce evidence that his father had implicated him in an out-of-court statement. We concluded that any error was harmless given defendant's own confession and affirmed his conviction. See *People v. Figueroa*, No. 1-96-0200, 709 N.E.2d 1008 (1997) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15    Defendant filed his first postconviction petition in 1997, alleging that his trial counsel was ineffective for refusing to allow him to testify and failing to inform him of his right to do so. The circuit court dismissed the petition as frivolous and patently without merit, and we affirmed that decision on appeal. See *People v. Figueroa*, No. 1-98-3107, 811 N.E.2d 786 (2001) (table) (unpublished order under Illinois Supreme Court Rule 23). In 2010, defendant sought leave to file a second postconviction petition, alleging that his confession had been coerced and that he was actually innocent. The circuit court denied defendant leave to file the petition, concluding that his claims were barred by *res judicata*. On appeal, we granted a motion to withdraw filed by defendant's appellate counsel and affirmed the circuit court's decision. See *People v. Figueroa*, No. 1-10-3135 (2011) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 16    In 2017, defendant again sought leave to file a successive postconviction petition, arguing that he was entitled to resentencing in light of "the latest scientific evidence on adolescent [brain]

development."[3] Quoting *Roper v. Simmons*, 543 U.S. 551 (2005), which held that the death penalty is unconstitutional for juvenile offenders, defendant noted the United States Supreme Court's recognition that it "is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573. Defendant argued that his sentence should likewise "reflect [the] latest scientific evidence on adolescent and young adult development, recognizing that youth who were under the age of 18 at the time of their crime have an especially strong ability to grow and change." The circuit court denied defendant leave to file a successive postconviction petition. The court explained that defendant was not entitled to resentencing because, with available day-for-day good-conduct credit, he may be eligible for release at the age of 55. Defendant filed a timely notice of appeal.

¶ 17                                    II. ANALYSIS

¶ 18    Defendant argues that the circuit court erred in denying him leave to file a successive postconviction petition challenging his sentence. He contends that his 75-year sentence for a murder he committed as a juvenile is unconstitutional under *Miller* because the trial court did not adequately consider his youth and its attendant characteristics before imposing the sentence. We review a circuit court's decision denying leave to file a successive postconviction petition *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 19    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) allows criminal defendants an avenue for challenging the constitutionality of their convictions and sentences.

---

[3] Although defendant called his pleading a "motion for resentencing," the circuit court construed it as a motion for leave to file a successive postconviction petition. Neither side argues that the circuit court erred in doing so.

*People v. English*, 2013 IL 112890, ¶ 21. Generally, a defendant may file only one postconviction petition, and any claim not raised in that petition is waived. *Bailey*, 2017 IL 121450, ¶ 15. A defendant may raise a claim in a successive postconviction petition, however, if he shows cause for failing to raise the claim earlier and resulting prejudice. *Id.* Cause is shown "by identifying an objective factor that impeded [the defendant's] ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2018). Prejudice is shown "by demonstrating that the claim not raised during [the] initial post-conviction proceedings so infected the [defendant's] trial that the resulting conviction or sentence violated due process." *Id.*

¶ 20    The State concedes (and we agree) that defendant has shown cause for failing to assert a *Miller* claim in his earlier postconviction proceedings. Defendant filed his initial postconviction petition in 1997 and first sought leave to file a successive postconviction petition in 2010. *Miller* was not decided until 2012, and our supreme court did not hold that it was retroactively applicable to cases on collateral review until 2014. See *People v. Davis*, 2014 IL 115595, ¶¶ 34-40. Because *Miller* was unavailable to defendant at the time he filed his earlier postconviction petitions, he has demonstrated cause for his failure to raise a *Miller* claim in those proceedings. *Id.* ¶ 42.

¶ 21    Defendant has also shown prejudice by demonstrating that his sentence is unconstitutional. *Miller* held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. The decision rested on the principle that "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. The Court identified "three significant gaps between juveniles and adults." *Id.* "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." (Internal quotation marks omitted.) *Id.*

"Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." (Internal quotation marks omitted.) *Id.* "And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted.) *Id.*

¶ 22    The Court explained that these "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472. Although the Court did not categorically bar life sentences for juveniles convicted of homicide offenses, it held that a life sentence could be imposed only if the sentencing court "[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Court noted that "appropriate occasions for sentencing juveniles to this harshest penalty will be uncommon," given "the great difficulty *** of distinguishing *** between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at 479-80.

¶ 23    In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016), the Court clarified that *Miller* "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth." (Internal quotation marks omitted.) "Even if a court considers a child's age before sentencing him or her to a lifetime in prison," the Court explained, "that sentence still violates the Eighth Amendment for a child whose crime

reflects unfortunate yet transient immaturity." (Internal quotation marks omitted). *Id.* at ___, 136 S. Ct. at 734. In other words, *Miller* "bar[red] life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at ___, 136 S. Ct. at 734.

¶ 24    Our supreme court has recognized that, under *Miller* and *Montgomery*, a life sentence may be imposed on a juvenile homicide offender "only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. The trial court "may make that decision only after considering the defendant's youth and its attendant characteristics," including

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) [his] family and home environment; (3) [his] degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) [his] incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) [his] prospects for rehabilitation." *Id.*

¶ 25    Our supreme court has also held that *Miller* and *Montgomery* apply not only to actual sentences of life without parole but also to *de facto* life sentences, those "term of years [sentences] that [are] the functional equivalent of life without the possibility of parole." *People v. Reyes*, 2016 IL 119271, ¶ 9. In *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41, the court concluded that any sentence of more than 40 years in prison for a juvenile offender constitutes a *de facto* life sentence.

¶ 26 With these principles in mind, we must decide two questions: whether defendant received a *de facto* life sentence and, if so, whether the trial court complied with *Miller* when imposing it. See *id.* ¶ 27. With respect to the first question, the State argues that defendant's 75-year sentence does not constitute a *de facto* life sentence because he is eligible to earn day-for-day good-conduct credit that could reduce his sentence to as little as 37.5 years, below the 40-year line adopted in *Buffer*.[4] But a panel of this court rejected the same argument in *People v. Peacock*, 2019 IL App (1st) 170308, *appeal docketed*, No. 125340 (Nov. 2019). There, the defendant received an 80-year sentence and was eligible to earn day-for-day good-conduct credit that could reduce the sentence to 40 years. *Id.* ¶ 3. Although the parties disputed whether a sentence of exactly 40 years constituted a *de facto* life sentence under *Buffer*, the court found it unnecessary to resolve that question because the defendant "was not sentenced to 40 years' imprisonment but was instead sentenced to 80 years' imprisonment with the mere possibility of release after 40 years." *Id.* ¶ 19.

¶ 27 As the court explained, a defendant's "receipt of [good-conduct] credit is not guaranteed." *Id.* Instead, "an inmate's right to receive [good-conduct] credits is contingent upon his good behavior while in prison," and the Illinois Department of Corrections (IDOC) may "revoke good-conduct credits for disciplinary infractions." (Internal quotation marks omitted). *Id.* Moreover, the sentencing court "has no control over the manner in which a defendant's good conduct credit is earned or lost." *Id.* Finally, the court noted that a defendant who was sentenced to 80 years in

---

[4] Defendant was sentenced before the enactment of the truth-in-sentencing statute, which prohibits defendants convicted of first degree murder from receiving sentence credit and requires them to serve their full sentences. See Pub. Act 90-592 (eff. June 19, 1998) (codified at 730 ILCS 5/3-6-3(a)(2)(i) (West 2018)). Under the law in effect at the time of defendant's sentencing, a "prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed," and "[e]ach day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court." 730 ILCS 5/3-6-3(a)(2) (West 1994).

prison could reduce his sentence to 40 years only by "receiv[ing] every single day of good conduct credit for which he could be eligible." *Id.* The court thus concluded that defendant's 80-year sentence was a *de facto* life sentence regardless of his opportunity to reduce the sentence by earning good-conduct credit.

¶ 28    Another panel of this court adhered to *Peacock* in *People v. Thornton*, 2020 IL App (1st) 170677. There, the court held that a 70-year sentence amounted to a *de facto* life sentence notwithstanding the defendant's eligibility to earn day-for-day good-conduct credit that could entitle him to release after 35 years. *Id.* ¶¶ 20-22. In *Thornton*, the State argued that *Peacock* was wrongly decided because *Miller* addressed the imposition of life sentences without the possibility of parole. *Id.* ¶ 21 (citing *Miller*, 567 U.S. at 479). The State also noted *Miller*'s proviso that " '[a] State is not required to guarantee [a juvenile's] eventual freedom,' but must only provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* ¶ 21 (quoting *Miller*, 567 U.S. at 479). The State argued that "a defendant who is statutorily entitled to cut his sentence in half by exhibiting good behavior while in prison has been afforded such an opportunity." *Id.*

¶ 29    In rejecting these arguments, the court reiterated that "day-for-day credit is not guaranteed and [that] it is IDOC, not the [sentencing] court, that has the ultimate discretion as to whether the defendant will be awarded any credit." *Id.* ¶ 22. The court also noted that, under the 70-year sentence at issue there, the defendant would "not serve a sentence shorter than a 40-year *de facto* life sentence unless he receives a substantial portion of the good conduct credit for which he is eligible." *Id.* The court thus concluded that, "regardless of the defendant's eligibility for day-for-day credit," his 70-year sentence was a *de facto* life sentence. *Id.*

¶ 30    In this case, the State again argues that *Peacock* was wrongly decided. The State reiterates that *Miller* applies only to sentences that provide no meaningful opportunity for a juvenile to obtain release during his lifetime based on demonstrated maturity and rehabilitation. The State argues that defendant's ability to reduce his sentence from 75 years to 37.5 years by earning good-conduct credit creates a meaningful opportunity for release. However, while the State correctly observes that IDOC may not revoke an inmate's good-conduct credits arbitrarily (see *Lucas v. Montgomery*, 583 F.3d 1028, 1029 (7th Cir. 2009) (discussing revocation procedure)), it overlooks the myriad infractions that may result in the loss of good-conduct credits and the low evidentiary bar that IDOC must clear before finding that an inmate has committed such an infraction.

¶ 31    Infractions that may subject an inmate to the loss of good-conduct credits include damaging or misusing State property (six months), disobeying a direct order (six months), gambling (three months), insolence (three months), unauthorized movement (one month), abuse of privileges (three months), possession of money or unauthorized property (three months), and filing a frivolous lawsuit (six months). See 20 Ill. Adm. Code § 504 Appendix A & Table A (eff. Apr. 1, 2017). If, after a hearing, IDOC is "reasonably satisfied [that] there is some evidence that the offender committed [one of these] offense[s]" (20 Ill. Adm. Code § 504.80(k)(1) (eff. Apr. 1, 2017)), it may recommend that the Prisoner Review Board (PRB) revoke the inmate's good-conduct credits in the amounts specified above (20 Ill. Adm. Code § 504.80(l)(4)(F) (eff. Apr. 1, 2017)); see 20 Ill. Adm. Code § 107.150(c) (eff. Mar. 1, 2019) (to revoke credit in excess of 30 days in any 12-month period, IDOC must submit recommendation to PRB for approval).

¶ 32    As the above list of disciplinary infractions makes clear, an inmate may lose good-conduct credit for a number of actions that may have little bearing on whether he has matured to the point

of being able to safely reenter and contribute to society. But for a juvenile offender like the defendant here, who was sentenced to a term of 75 years in prison, any hope of obtaining release in 40 years or less will depend on his ability to maintain a near perfect disciplinary record for almost four decades. We do not think that the "mere possibility" that defendant may earn enough good-conduct credit to complete his sentence after serving 37.5 years is the type of meaningful opportunity for release based on demonstrated maturity and rehabilitation that *Miller* envisioned. *Peacock*, 2019 IL App (1st) 170308, ¶ 19.

¶ 33    The State argues that *Peacock* is inconsistent with our supreme court's decisions in *Reyes* and *People v. Patterson*, 2014 IL 115102, which discussed juvenile offenders' eligibility to earn good-conduct credit when determining whether their term-of-years sentences were *de facto* life sentences. But the State overreads those decisions. In *Reyes*, the defendant was sentenced to a term of 97 years in prison. 2016 IL 119271, ¶ 2. The court noted that, under the truth-in-sentencing law, he would be required to serve at least 89 years before becoming eligible for release. *Id.* Because the sentence "mandated that [the defendant] remain in prison until at least the age of 105," the court deemed it the functional equivalent of life without parole and thus a *de facto* life sentence. *Id.* ¶¶ 9-10. However, while the court emphasized the number of years the defendant would be required to serve with available good-conduct credits rather than the length of his sentence as imposed, it did not squarely address which figure was determinative under *Miller*. Because the defendant's sentence was equivalent to life without parole under any measure, we do not read *Reyes* as answering the question presented here.

¶ 34    Nor did *Patterson* address the question. The defendant there was sentenced to 36 years in prison for offenses committed as a juvenile but would be eligible for release after serving a little

more than 30.5 years if he earned all available good-conduct credit. See 2014 IL 115102, ¶ 108. Although the court noted the number of years the defendant would be required to serve before becoming eligible for release, it ultimately concluded that the 36-year term itself did not fall into the category of "the most severe of all criminal penalties" governed by *Miller* and related decisions. *Id.* ¶ 110.

¶ 35     The State also discusses this court's decision in *People v. Evans*, 2017 IL App (1st) 143562, which held that a 90-year sentence did not constitute a *de facto* life sentence because the defendant would be eligible for release after 45 years with available good-conduct credit. *Id.* ¶ 14. But *Buffer* abrogated *Evans*'s bottom-line holding that a sentence of at least 45 years in prison is not a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 40-42. For that reason, and because *Evans* is otherwise inconsistent with this court's more recent decisions in *Peacock* and *Thornton*, we decline to follow it here. Instead, we adhere to *Peacock* and *Thornton* and hold that defendant's 75-year sentence constitutes a *de facto* life sentence, despite his eligibility for day-for-day good-conduct credit.

¶ 36     Having found that defendant received a *de facto* life sentence, we now must decide whether the trial court complied with *Miller* when imposing the sentence. We conclude that it did not. As discussed above, *Miller* "bar[red] life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Thus, before sentencing a juvenile offender to life in prison, the trial court must "determine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. When making that assessment, the trial court must consider (1) the defendant's age and age-related characteristics, such as immaturity, impetuosity, and recklessness; (2) the defendant's family and

home environment; (3) the extent of the defendant's participation in the offense and whether he was influenced by pressure from family or peers; (4) the defendant's inability to deal with police and prosecutors or assist his own attorneys due to age-related incompetencies; and (5) the defendant's prospects for rehabilitation. *Miller*, 567 U.S. at 477-78; *Holman*, 2017 IL 120655, ¶ 46.

¶ 37    Nothing in the record suggests that the trial court considered defendant's age and age-related characteristics or determined that he was one of the rare juvenile offenders "whose crimes reflect[ed] permanent incorrigibility" rather than "unfortunate yet transient immaturity." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Although the court noted defendant's age and indicated that it had reviewed the PSI, a court's "mere awareness of a defendant's age and consideration of a PSI does not provide evidence that [it] specifically considered [the] defendant's youth and its attendant characteristics." *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13. In fact, the court's only mention of defendant's age was its remark that, but for his age, defendant would have received a natural life sentence. The court did not discuss whether the characteristics of immaturity, impetuosity, and recklessness associated with defendant's youth diminished his culpability for the murder. Nor did the court consider whether defendant was pressured or otherwise influenced by his father and the other older men that he joined in committing the murder. Most importantly, the trial court did not assess defendant's prospects for rehabilitation. It is true that the prosecutor and defense counsel addressed these points, to varying degrees, in their arguments. But that did not relieve the trial court of its obligation to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," before sentencing defendant to a *de facto* life term. *Miller*, 567 U.S. at 480.

¶ 38    The trial court's primary focus at the sentencing hearing was on the brutality of the murder. Based on the evidence presented at trial, the court found that defendant was "a person who *** puts no value on human life" and "is ruthless, cold, calculated[,] and *** savage." The court also found that defendant's actions were "unconscionable and beyond comprehension." But the trial court made no finding that defendant was one of the rare juvenile offenders whose actions reflected *irretrievable* depravity and *permanent* incorrigibility rather than unfortunate yet transient immaturity. Because "the trial court focused on the brutality of the crime *** with no corresponding consideration given to defendant's opportunity for rehabilitation," defendant's *de facto* life sentence does not comport with *Miller*. *People v. Paige*, 2020 IL App (1st) 161563, ¶ 40.

¶ 39    The proper remedy in these circumstances is not to remand for further postconviction proceedings, but to vacate defendant's sentence and remand for a new sentencing hearing. See *Buffer*, 2019 IL 122327, ¶ 47; *Peacock*, 2019 IL App (1st) 170308, ¶ 25.

¶ 40                            III. CONCLUSION

¶ 41    For the foregoing reasons, we reverse the circuit court's order denying defendant leave to file a successive postconviction petition, vacate defendant's sentence, and remand to the circuit court to conduct a new sentencing hearing.

¶ 42    Reversed and remanded with directions.

---

**No. 1-17-2390**

---

| | |
|---|---|
| **Cite as:** | *People v. Figueroa*, 2020 IL App (1st) 172390 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 92-CR-27511; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Jessica L. Wasserman, Assistant State's Attorneys, of counsel), for the People. |

---