# Illinois Official Reports

## Appellate Court

---

### *People v. DiCorpo*, 2020 IL App (1st) 172082

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DINO DICORPO and DANIEL HENNEY, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Nos. 1-17-2082, 1-17-2253 cons. |
| Filed<br>Rehearing denied | December 3, 2020<br>January 8, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 98-CR-2838; the Hon. Paula M. Daleo, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender (Patricia Mysza and Christopher L. Gehrke, Assistant Appellate Defenders, of Chicago, and Catherine K. Hart and Roxanna A. Mason, Assistant Appellate Defenders, of Springfield), for appellants.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, William Merritt, and Kevin P. Nolan, Assistant State's Attorneys, of counsel), for the People. |

Panel            PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.


# OPINION

¶ 1        Defendants Dino DiCorpo and Daniel Henney, both age 17, were convicted after separate jury trials of first degree murder, arson, and burglary and were sentenced to natural life in prison for murder, as well as a concurrent 7-year sentence for burglary and a consecutive 30-year sentence for arson. Recently, the trial court granted their postconviction petitions pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and conducted a joint resentencing hearing. It is from this resentencing that defendants now appeal.

¶ 2        At the resentencing, the trial court found that the "only" issue before it was the natural-life sentence for murder. For this offense, the trial court sentenced DiCorpo to 60 years and Henney to 50 years. As a result of the consecutive 30-year sentence for arson, the total aggregate sentence for DiCorpo is now 90 years and for Henney 80 years. Both defendants appeal claiming, among other things, that the trial court erred by declining to impose new aggregate sentences.

¶ 3        For the following reasons, we reverse and remand for resentencing on defendants' aggregate sentences.


¶ 4                              BACKGROUND

¶ 5        This court already described the trial evidence in both a prior opinion and a prior Rule 23 order, and we incorporate those decisions by reference. *People v. Henney*, 334 Ill. App. 3d 175 (2002); *People v. DiCorpo*, No. 1-00-0562 (2002) (unpublished order under Illinois Supreme Court Rule 23). In sum, defendants' convictions stem from a fire set in the early morning hours of September 15, 1997. The State's evidence at trial established the following facts. Defendants were driving around with two other friends looking for something to steal. After they pulled into an alley behind an apartment building, defendants exited the vehicle and entered the back porch of the building. When defendants realized that there was nothing on the back porch worth stealing, they set fire to a sheet hanging on a clothesline. The fire eventually swept through the apartment of Anthony Poull, killing his five children. Poull died five days later from his injuries.

¶ 6        After severed jury trials, defendants were each convicted of six counts of first degree murder and one count each of burglary, arson, and aggravated arson. At the original joint sentencing hearing on January 18, 2000, the trial court stated that it was entering judgment and sentence on count I and merging all the murder counts into it.[1] On this count, the court sentenced defendants to natural life in prison without the possibility of parole. Count I alleged that defendants "intentionally and knowingly ignited a fire *** knowing that such acts would cause death to Kevin Poull or another." The trial court also merged the arson count into the aggravated arson count and observed that, since aggravated arson was a Class X felony, the

_____

[1]The sentencing orders for both defendants mistakenly state that the trial court entered judgment on "Murder (6 counts)."

law required the aggravated arson sentence to run consecutively to the murder sentence. While imposing a 30-year consecutive term for aggravated arson, the trial court observed that this sentence would have "no effect here," in light of the natural-life sentence. Lastly, the trial court imposed a concurrent seven-year term for burglary. On February 14, 2000, the trial court denied, without argument, defendants' motions to reconsider sentence.

¶ 7     On direct appeal, Henney argued, among other things, that the trial court erred in imposing a consecutive sentence for aggravated arson. *Henney*, 334 Ill. App. 3d at 190. The relevant statute prohibited a consecutive sentence if the offenses were committed as part of a single course of conduct, but it required a consecutive sentence if one of the offenses was first degree murder and the defendant inflicted severe bodily injury. See 730 ILCS 5/5-8-4(a) (West 1996). Henney argued that the imposition of consecutive sentences in his case amounted to an improper double punishment, on the ground that he was being punished twice for murder. *Henney*, 334 Ill. App. 3d at 191. The appellate court did not find this claim persuasive, citing other appellate cases that had previously rejected this type of claim. *Henney*, 334 Ill. App. 3d at 191.

¶ 8     On direct appeal, DiCorpo argued, among other things, that the consecutive arson term violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *DiCorpo*, No. 1-00-0562, slip order at 2. The appellate court did not find this claim persuasive since the Illinois Supreme Court had found that *Apprendi* did not apply to consecutive sentences. *DiCorpo*, No. 1-00-0562, slip order at 11.

¶ 9     On July 16, 2003, Henney filed a *pro se* postconviction petition that alleged, among other things, that his natural life sentence, imposed when he was a juvenile, violated the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970 art. I, § 11. On February 27, 2004, the trial court docketed his petition and subsequently appointed the public defender as counsel.[2] On April 9, 2004, the State moved to dismiss, which was denied, and counsel was appointed. Over 10 years later,[3] on May 22, 2015,[4] Henney's counsel filed both a motion for a new sentencing hearing, pursuant to *Miller* and the eighth amendment, and a motion to bifurcate the sentencing hearing from the postconviction proceeding. At a hearing on May 22, the State agreed that defendant was "entitled to a new sentencing hearing under *Miller*" but objected to bifurcating the proceeding. Henney's counsel responded that she was "very close to completing" her investigation and that Henney "may be" raising an actual innocence claim. The trial court observed: "If this is a *Miller* issue and I vacate the sentence right now, then the postconviction matters fall by operation of law. Then all that does for us is, after we resentence, we'll see the postconviction matter again." The trial court then granted "the new sentencing hearing under *Miller*" but declined to rule on the motion to bifurcate. On September 25, 2015, Henney's counsel confirmed that she was "making an actual innocence claim on behalf of *** Henney."

---

[2]The trial court observed that this was the first time it was aware of the petition and, given the time lapse, the petition had to be docketed.

[3]Starting on November 16, 2012, the trial judge for the postconviction proceedings was no longer the same trial judge who had presided over the original trial and sentencing proceedings.

[4]At the proceeding on May 22, 2015, the assistant state's attorney observed that she had filed the State's motion to dismiss in 2004, and "here we are in 2015, 11 years later, still waiting for a supplemental petition."

¶ 10    On January 23, 2015, DiCorpo filed a *pro se* postconviction petition[5] alleging that his life sentence violated *Miller* and the eighth amendment. The trial court docketed his petition on January 30 and appointed the public defender. On May 29, 2015, the trial court granted DiCorpo's petition and ordered a new sentencing hearing.

¶ 11    On December 17, 2015, both defendants appeared at the same court proceeding. Henney's counsel raised the issue of vacating both the natural life sentence and the 30-year consecutive arson sentence. The assistant state's attorney (ASA) responded that her "understanding was that [the court had] vacated his sentence without discussion of the individual components of that sentence." The trial court then asked Henney's counsel "are you asking that his—the whole sentence be vacated?" Henney's counsel responded: "No. We are asking only for the natural life portion." She explained: "My office's position on the PC per my division chief is that as long as he has this extra 30 year sentence that we cannot—that the PC is still in existence. We cannot withdraw."

¶ 12    The ASA responded that Henney had been in custody since December 1997 and "if you do the math, he—it was only the 30 year sentence. He's probably served that sentence. But it was ordered to run consecutive to the natural life sentence. If the life sentence is gone and all IDOC is calculating is 30 years, he's probably got enough credit to have served that sentence." Henney's counsel then informed the court that Henney had six months "to go" on the 30-year sentence.

¶ 13    On December 30, 2015, only Henney's case was called. Henney's counsel stated that he was "withdrawing [his] petition today," and the trial court signed an order that allowed defendant "to withdraw his petition for postconviction relief without prejudice." The trial court informed Henney: "What this means, sir, is this does not foreclose you from re-filing your PC if you're so inclined after re-sentencing."

¶ 14    The ASA stated that the State agreed that Henney's mandatory natural life sentence was unconstitutional but "that brings another issue," which was "whether or not the sentences for aggravated arson and burglary remain in effect." The ASA stated: "Obviously this is a felony murder[6] based on an aggravated arson and burglary. Those findings of guilt remain intact as to the murder findings of guilt." The trial court then found: "so it's perfectly clear, I will vacate the natural life sentence on the murder counts, *nunc pro tunc* to May 22nd, 2015."[7]

¶ 15    On March 16, 2017, a joint resentencing hearing was held for both DiCorpo and Henney. In her opening statement, the ASA stated: "While they were convicted of aggravated arson, which did run consecutive of the time [*sic*], those counts were vacated, so we're only here for the murder count, which will run consecutive to each other." The trial court inquired: "You said that the court vacated the aggravated arson conviction. What court?" The ASA responded: "On the half sheet, Judge, for Mr. Henney, it appears that it was vacated." The ASA stated that it was on Henney's half-sheet but not on DiCorpo's half-sheet. The trial court found:

---

[5]The 2015 postconviction petition was DiCorpo's first petition.

[6]The one count upon which the life sentence was imposed was not a felony murder count.

[7]The subsequent written order, dated December 30, 2015, stated that "the sentence of natural life on petitioner Daniel Henney is hereby vacated and a new sentencing hearing [will] be held pursuant to the findings in *Miller v. Alabama* *** and *People v. Davis*, 2014 IL 115595 ***. *Nunc pro tunc* to May 22, 2015."

- 4 -

"the only thing that we're here to do is resentence, as far as I'm concerned, unless I find—hear a transcript or see something. I'm here to resentence on *both* the aggravated arson and the murder charges. That's the way I'm looking at the record at this point." (Emphasis added.)

The ASA observed that, "then the max the defendants could be sentenced to, if the Court did not want to sentence these defendants to natural life, would be 90 years."

¶ 16 DiCorpo's case proceeded first, and his counsel called Dr. Robert Hanlon, a psychologist who had evaluated DiCorpo. Hanlon was accepted, without objection, as an expert in the field of neuropsychology. Based on his examination of DiCorpo's past medical records, Dr. Hanlon found that, during DiCorpo's adolescence, he was diagnosed with attention deficit hyperactivity disorder, various mood disorders, and conduct disorders, including impulse control disorder and oppositional defiant disorder, and that DiCorpo had also been a drug user. As a result, DiCorpo had been admitted to various facilities including Linden Oaks Hospital, Riveredge Hospital, and Allendale School. During one hospitalization, he was diagnosed with major depression.

¶ 17 Dr. Hanlon also conducted his own tests of and interviews with defendant. Concerning DiCorpo's present psychological condition, Dr. Hanlon opined that, "despite the *** adolescent and child abnormalities that [DiCorpo] manifested, *** as *** documented in his medical records, in my evaluation, he showed no objective evidence of neuropsychological impairment and his intelligence was in the high average range." Dr. Hanlon opined that DiCorpo had psychological problems in the past that he currently does not have because, "as he continued to mature and his brain developed into an adult brain, he no longer manifested the kind of neurochemical instabilities that tend[ed] to characterize him during childhood and adolescence" and "resulted in the various diagnoses that he received during that time."

¶ 18 DiCorpo's mother testified that, during her marriage to DiCorpo's father, she endured physical and mental abuse, which led to her use of drugs. As a result, DiCorpo's home life was chaotic, and he witnessed violence, abuse, and drug use. At one point, they were homeless. When DiCorpo was in the first grade, she divorced her husband and had little means of supporting herself or her children, so she moved to a low-income neighborhood, which had gangs and drugs. In addition to her drug problems, she had Lupus and was generally unable to supervise her children. DiCorpo began using drugs. Although he was intelligent, he was "always misbehaving" in school. He was "always hyper and moving and not paying attention." Eventually, he was diagnosed with psychological problems and was admitted into various hospitals and institutions, such as Riveredge Hospital and Allendale School. When DiCorpo was sentenced to life in prison, she "fell apart" and attempted suicide several times. During his time in prison, she has observed an enormous improvement in her son. Now, he is "a calm, very mature young man who thinks logically" and has better communication skills. She testified that she is "clean and sober" but admitted that she was sentenced in 2013 for felony driving under the influence.

¶ 19 DiCorpo's sister Teresa testified that she was married with four children and that she was employed running the office of a bricking company. She testified that, when she and DiCorpo were growing up, their family home was "[s]cary" and "volatile," with little parental supervision. Their father was abusive to their mother and to the children, including DiCorpo, and DiCorpo would try to intervene to protect them when their father was abusive to their mother or the other children. At school, DiCorpo was often in trouble for fighting and

disobeying. Eventually, he was admitted to several "mental institutions," where she visited him, including Riveredge Hospital, Allendale School, and Linden Oaks. When DiCorpo was sentenced to life in 2000, she was 17 or 18 years old. The sentence's effect on her was "devastating because he was our protector and he was gone." Their mother was never sober, which left her and her sister to raise their little brother, and they had to "grow up very fast." She has observed a change in DiCorpo since his imprisonment, in that he is now "an adult and not an angry, depressed child."

¶ 20    DiCorpo's sister Nina testified that she was married with two children and was a "Master Sergeant" in the Air Force, where she has served for 17 years. When asked to describe her childhood home, she described it as "[c]haotic, crazy, abusive, volatile, unstable." Her father was abusive, mostly to her mother and to DiCorpo. Because of their father's abuse, DiCorpo was angry and "[o]ut of control." He often had behavior problems at school, which led him to be admitted to several institutions, including Allendale School, Riveredge Hospital, and Linden Oaks. Defendant's life sentence "tore our family apart."

¶ 21    Henney did not present live witnesses. However, his parents were present in court, and his counsel indicated that he would read their letters during closing argument.

¶ 22    In addition, the court received into evidence mitigation packets from both Henney and DiCorpo. Henney's 59-page packet established that he has a nurturing family and that, while incarcerated, he has regularly attended classes, self-help groups, and religious activities. The packet contained letters from supportive family members, a correctional officer who had known Henney during Henney's entire incarceration, and a volunteer prison minister. There were also completion certificates from numerous courses, as well as awards for his poetry, writing, and art. The packet included a three-page list of disciplinary infractions current through January 4, 2013. However, the last infraction was in 2006.

¶ 23    DiCorpo's 315-page packet did not contain original documents, such as letters or certificates. Instead, the packet provided 21 "themes" and listed "facts" in chronological order after each theme. The 21 themes were as follows: (1 through 3) his biological parents were Dino DiCorpo II and Susanne DiCorpo, who "had a turbulent and violent relationship"; (4) DiCorpo's "early childhood experiences" were chaotic; (5) "Dino DiCorpo II was an abusive father, who greatly affected Dino DiCorpo's development and behavior"; (6) DiCorpo tried to "protect*** his siblings"; (7) "[a]fter Susanne DiCorpo's divorce, life did not get easier for her or her children"; (8 and 9) "DiCorpo had significant behavioral troubles in school" and "early troubles with the law"; (10) "DiCorpo grew up in a home that lacked the supervision and structure he needed"; (11 through 13) "DiCorpo had childhood experiences" starting fires and "severe behavioral problems," "was often out of control," and "was susceptible to peer and gang pressure as a child and adolescent"; (14) "DiCorpo had drug and alcohol addiction as an early adolescent, which became ruinous as he grew older"; (15) "[a]dults took advantage of *** DiCorpo and directed him toward substance abuse and crime"; (16) "DiCorpo moved out and tried to find employment, but, without structure and an ability to control his behavior, his life deteriorated"; (17 and 18) after his arrest and life sentence, "his family was devastated and was in danger of collapse"; and (19 through 21) "Dino DiCorpo is filled with remorse over his crime," has "tried to do well in prison," and "has the support to enter society."

¶ 24    The State called no live witnesses, but Colleen Poull, the wife and mother of the victims, was present in court, and she had prepared a victim impact statement. In the statement, she described how, in the fire, she "lost everything. [She] lost [her] family, [her] home, all

memories, pictures, everything" and was left only "with the clothes on [her] back." The parties stipulated to the admission of DiCorpo's and Henney's disciplinary records from the Illinois Department of Corrections (IDOC). Henney had 26 infractions, while DiCorpo had 28 infractions. The prosecutor argued that, while most of Henney's infractions were for "not listening," DiCorpo had the "more serious" infractions. The court also admitted into evidence, over a defense objection, the photographs of the victims and the crime scene that had previously been admitted into evidence at trial.

¶ 25　　During closing argument, the prosecutor observed that the sentencing range for the aggravated arson count was 6 to 30 years. She asked the court to sentence defendants to 30 years for the arson and 60 years for the murder, for an aggregate sentence of 90 years. The prosecutor argued that, since a 90-year sentence would be served at 50%, the actual aggregate sentence would be 45 years and defendants would be 63 years old when released. DiCorpo's counsel asked "for an appropriate time in this case that's not *de facto* life." Henney's counsel asked for a sentence on the murder count "not to exceed 40 years," for an aggregate sentence of not more than 70 years.

¶ 26　　Henney's counsel then read to the court letters from Henney's parents and sister. Henney's parents talked about "his hyperness" and how it caused him to have difficulties in school and led to fights and, eventually, drugs. Henney's parents stated that they had observed "a great change in him now." Henney's sister stated that Henney was "a troubled child" who struggled in school and socially. He had a learning disability, and "[m]ost kids didn't want to play with him because of his hyperness." Their parents struggled to find "the right school" for him "with his disabilities," which made it harder for him to make and keep friends. When he was 15 years old, he became friends with some teenagers in the neighborhood, which led to an observable difference in Henney. He "lost a lot of weight" and became defensive and argumentative, which led to fights. In prison, he "gr[e]w up." He entered prison not being able to read and write commensurate with his age level but now had worked diligently to educate himself.

¶ 27　　Lastly, defendants addressed the court directly. DiCorpo stated that he was sorry, that he never meant to hurt anyone, and that he "turned a moment of partying and drugs into a tragedy." Henney acknowledged that he had "made mistakes" and was sorry.

¶ 28　　The trial judge observed that, since she had not been the original trial judge, she needed time to read the trial transcripts and the proceeding needed to be continued. However, prior to adjourning for the day, the trial court asked:

> "I would like the State to somehow show me where in this record they think that the agg [*sic*] arson charge was vacated. I don't know what the date is, but if there is a date, I will order that transcript. Because, again, in my reading of the Appellate record on—or the Appellate opinion that came down affirming this case, there was no indication that the agg. arson conviction was to be vacated."

¶ 29　　On July 18, 2017, the proceeding resumed, and the trial court read its decision. First, it found that "the aggravated arson and burglary convictions stand and their sentences stand." Thus, "the only thing *** to be determined today" was "whether the defendants should be resentenced" for murder "to a discretionary sentence of natural life or a term of years."

¶ 30　　Next, the trial court reviewed a number of factors. With respect to defendants' age, she observed that Henney was "40 days away from turning 18" and DiCorpo was 93 days "away from turning 18," and "but for those few days" defendants "would have been considered adults" and "we would not be sitting here." The court stated that "all of us know" adults "who

- 7 -

don't use the best judgment" while "we know some very mature young people." The court found that defendants "were closer to being legally adults than they were children in my opinion. But, nonetheless, *** the Supreme Court has told me that someone under 18 is still a child."

¶ 31     With respect to the offense, the court observed that the facts of the crime were horrific and "devastating" and that defendants drove around the block three times to verify that a fire had started but did not contact the police. Both defendants had prior criminal histories with several offenses, including burglary. In addition, DiCorpo had a history of starting fires when he was young. While incarcerated for this offense, both men had disciplinary issues. However, DiCorpo had "significant tickets" in IDOC and became involved with gangs, while Henney did not become involved in gangs and sought counseling for his issues. DiCorpo "only recently" decided to leave gang life. With respect to their family backgrounds, the court observed that, although DiCorpo grew up in an abusive environment, he had siblings who grew up to be successful. The court noted that Henney's family history was "totally the opposite" of DiCorpo's family history and that Henney had a "strong family" and "a normal childhood."

¶ 32     Finding that Henney had greater rehabilitative potential, the trial court imposed a sentence of 50 years on Henney while imposing a sentence of 60 years on DiCorpo. The trial court noted: "Those are the sentences for murder. Those will run consecutive to the aggravated arson." The court stated that "the total years for Mr. DiCorpo are 90 at 50 percent" while "the total" for Henney was 80 years, "served at 50 percent."

¶ 33     Defendants immediately moved to reconsider their sentences, and their motions were argued orally and decided before their written motions were filed. Defendants argued that their aggregate sentences were *de facto* life sentences, and the State responded that DiCorpo, for example, would be released when he was 63 years old, so that was not a *de facto* life sentence. The trial court denied their motions.

¶ 34     Henney's subsequently filed written motion argued, among other things, that the trial court "on this date held that the previously entered 30 year sentence for Aggravated Arson *** shall stand" and is consecutive and that "[t]his sentence is excessive in light of the Defendant's age."

¶ 35     DiCorpo's written motion argued that the trial court "resentenced the defendant to 90 years" and that this sentence was excessive.

¶ 36     DiCorpo and Henney filed timely notices of appeal on July 18, 2017, and August 9, 2017, respectively, and this court consolidated their appeals.

¶ 37                                    ANALYSIS

¶ 38     Defendants claim, among other things, that the trial court erred by finding that the aggravated arson sentence was not an issue at resentencing and by failing to resentence them on their aggregate sentences.

¶ 39                                 I. Not Forfeited

¶ 40     The State argues that this claim has been forfeited. The State filed two appellate briefs: one filed with respect to Henney and one filed with respect to DiCorpo after this court consolidated the two appeals. In both briefs, the State argued that, by failing to object at the sentencing

hearing, both defendants had forfeited any claim that the trial court failed to resentence them on their aggregate sentences.[8]

¶ 41 To preserve a sentencing issue for appeal, a defendant must raise the issue at the sentencing hearing and in a postsentencing motion. See *People v. Hiller*, 237 Ill. 2d 539, 544-45 (2010) (defendant forfeited objection to sex offender evaluation, when he failed to object either when trial court stated it was ordering it or when it was later admitted at the sentencing hearing); *People v. Ballard*, 206 Ill. 2d 151, 192 (2002).

¶ 42 At the start of the sentencing hearing at bar, the trial court found that "the only thing that we're here to do is resentence, as far as I'm concerned ***. I'm here to resentence on *both* the aggravated arson and the murder charges." (Emphasis added.) This finding provided no ground for defendants to object. However, at the conclusion of the hearing, when the trial court read its decision, it found just the opposite—that the aggravated arson sentence would "stand" and that "the only thing" before it was the murder sentence. After the trial court announced its decision, defendants objected both orally at the hearing and subsequently in writing that their aggregate sentences were excessive. Moving to reconsider, DiCorpo argued orally at the hearing that his aggregate 90-year sentence was a *de facto* life sentence. In support, he cited *People v. Reyes*, 2016 IL 119271 (*per curiam*), a then-recent Illinois Supreme Court case that found a sentencing court must consider a juvenile's aggregate sentence. As for Henney, in his written motion to reconsider, he argued that, "on this date," the trial court found that "the previously entered 30 years sentence for Aggravated Arson" still stood and that, with the murder sentence running consecutively to it, "[t]his sentence is excessive." Thus, defendants preserved for review their claim that the trial court erred in not resentencing them on their aggregate sentences.

¶ 43 In its brief to this court, the State argues that the trial court did, in fact, resentence defendants on the aggravated arson count. However, this argument is not supported by the record. The trial court began its decision by stating that the aggravated arson sentence stood and that the "only" sentence before it was the murder sentence. After these preliminary findings, the trial court discussed a long list of factors, which it then applied to determining a new murder sentence. Thus, the State's argument is unsupported by the record.

¶ 44 The State also argues that Henney "initially sought to strategically limit defendant's claim to his natural life sentence so as not to affect his other postconviction petitions." However, that concern vanished when Henney withdraw his petition. As a result, Henney offered no objection when the trial court announced, at the start of the resentencing hearing, that it would resentence "both" the aggravated arson and murder counts. The State's argument pulls facts out of their chronological context and, thus, is not persuasive.

¶ 45 In response to the State's forfeiture argument, defendants argue in their reply briefs that we should consider their claim under the plain error doctrine. However, this argument applies only if we found the claim unpreserved.

¶ 46 Since the issue is preserved, a harmless-error analysis applies. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). In a harmless-error analysis, it is the State that bears the burden of

---

[8]The assistant state's attorney who appeared at oral argument was listed as an author on both the State's appellate briefs. Yet the State did not raise forfeiture as an issue during oral argument and seemed unaware when asked if the State was abandoning that argument. Since the issue was raised in both briefs, we address it in our opinion and explain why this issue was not forfeited.

persuasion with respect to prejudice. *Thurow*, 203 Ill. 2d at 363. In other words, the State has the burden of showing, beyond a reasonable doubt, that the sentencing court "would have reached the same finding" absent the error. *People v. Shaw*, 186 Ill. 2d 301, 341 (1998); see also *People v. Banks*, 237 Ill. 2d 154, 197 (2010) (sentencing error does not require reversal if "harmless beyond a reasonable doubt" and "no prejudice resulted to defendant").

¶ 47                                     II. Not Harmless

¶ 48        We are all familiar with the adage that bad facts often make bad law. *E.g.*, *Domingo v. Guarino*, 402 Ill. App. 3d 690, 696 (2010) (quoting the adage that " 'bad facts make bad law' "). The facts here are devastating, but the legal question is straightforward: when convictions stem from one single course of events within a short time span, should a trial court, when resentencing a juvenile defendant pursuant to the *Miller* factors, resentence the aggregate sentences or only the single natural-life sentence that led to the resentencing? We are not called upon to consider and, thus, do not consider whether a court should consider an aggregate term that is *not* the result of a continuous course of conduct. That question is not before us, so we leave it to another day. The question before us is the much simpler question of an aggregate sentence stemming from one single course of conduct.

¶ 49        In *Reyes*, our supreme court found that, when determining whether a juvenile's sentence was or was not a life sentence under *Miller*, one must look at the aggregate sentence from a single course of conduct. *Reyes*, 2016 IL 119271, ¶ 10; *People v. Mahomes*, 2020 IL App (1st) 170895, ¶¶ 12, 24 (a 17-year-old defendant's "total," aggregate sentence of 44 years violated *Miller*). In *Reyes*, our supreme court observed that the juvenile defendant had "committed offenses in a single course of conduct," which subjected him to sentences resulting in life imprisonment. *Reyes*, 2016 IL 119271, ¶ 10. The appellate court had held that *Miller* applied only to an actual life sentence and had decided "not to aggregate consecutive sentences that amounted to a *de facto* life term." *Reyes*, 2016 IL 119271, ¶ 6. Our supreme court reversed the appellate court and remanded for resentencing on the "aggregate sentence." *Reyes*, 2016 IL 119271, ¶ 12 (observing that, on remand, the minimum "aggregate sentence" would be 32 years and, thus, "a term that is not a *de facto* life sentence"); *Mahomes*, 2020 IL App (1st) 170895, ¶¶ 24-25 (vacating a juvenile's aggregate sentence and remanding for resentencing on it).

¶ 50        While the trial court was aware what the resulting aggregate sentence would be, that is different from saying that the lack of a resentencing on the aggravated arson count was harmless beyond a reasonable doubt. The trial court made it clear at the start that the aggravated arson sentence would simply stand and that it was fashioning an appropriate sentence on "only" the murder offense. The trial court stated emphatically that the murder sentence was "the only thing" at issue before it at the resentencing.

¶ 51        Thus, we cannot find that this error was harmless beyond a reasonable doubt and must remand for resentencing.

¶ 52        If we had any doubt about the need for resentencing in this case, it is erased by the internal inconsistency in the trial court's findings, as a result of subsequent caselaw. In the case at bar, the trial court decided not to impose a life sentence, finding that it was not an "appropriate" sentence in this case. However, our supreme court has since found that a sentence over 40 years imposed on a juvenile is, in fact, a life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 42 (a sentence "greater than 40 years" is "a *de facto* life sentence"). The only way that the sentence

- 10 -

imposed on DiCorpo could be considered not a life sentence is if one considers only the murder sentence and considers it at 50%. DiCorpo's murder sentence at 50% was 30 years. However, once the 30-year aggravated arson sentence is added on, then his aggregate sentence, even if considered at 50%, becomes a life sentence—which the trial court specifically declined to impose.

¶ 53    Even though Henney's aggregate sentence, if considered at 50%, is exactly 40 years, that is only if he receives every single day of good-time credit for which he is eligible. *People v. Peacock*, 2019 IL App (1st) 170308, is directly on point. It considered the exact same sentence that Henney received, namely, an 80-year sentence, to be served at 50%. This court found that a "defendant's 80-year sentence, for which he may receive day-for-day credit, constitutes a *de facto* life sentence." *Peacock*, 2019 IL App (1st) 170308, ¶ 19. This court explained:

"Defendant was not sentenced to 40 years' imprisonment but was instead sentenced to 80 years' imprisonment with the mere possibility of release after 40 years. Moreover, to serve a sentence of 40 years, he must receive every single day of good conduct credit for which he could be eligible. Defendant's receipt of day-for-day credit is not guaranteed." *Peacock*, 2019 IL App (1st) 170308, ¶ 19.

Thus, the trial court's finding that a life sentence was not appropriate for these defendants is now in conflict with the sentences that it gave, in light of recent caselaw. See *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 21 (rejecting the State's arguments that "*Peacock* erred"); *People v. Figueroa*, 2020 IL App (1st) 172390, ¶ 35 ("we adhere to *Peacock* and *Thornton*"); *People v. Daniel*, 2020 IL App (1st) 172267, ¶¶ 23-26 (applying *Peacock* and *Thornton* to find that a 70-year sentence was *de facto* life, even though defendant was eligible for day-for-day good-conduct credit that could "reduce his time served to 35 years"); *People v. Quezada*, 2020 IL App (1st) 170532 ("We decline to depart from our holding in *Peacock*.").

¶ 54    "[A] juvenile defendant may be sentenced to life or *de facto* life imprisonment, but before doing so, the trial court must 'determine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Peacock*, 2019 IL App (1st) 170308, ¶ 22 (quoting *People v. Holman*, 2017 IL 120655, ¶ 46); *Figueroa*, 2020 IL App (1st) 172390, ¶ 24 (same); *People v. Hill*, 2020 IL App (1st) 171739, ¶ 46 (for a "*de facto* life sentence, the court must find permanent incorrigibility"). Not only did the trial court not make such a finding, it contemplated a release date of 63 years old or earlier for these defendants, thereby implicitly finding their capacity for rehabilitation by then. See *Mahomes*, 2020 IL App (1st) 170895, ¶ 23 ("the *Buffer* case *** capped a juvenile defendant's sentence to 40 years unless the sentencing court specifically finds that such defendant is beyond rehabilitation"). The trial court specifically considered defendants' "rehabilitative potential" and found Henney's "rehabilitative potential" greater than DiCorpo's, thereby meriting a shorter term. However, the court did not find DiCorpo without rehabilitative potential. The court acknowledged that it could give a life sentence for an "incorrigible" defendant, but it rejected a life sentence for DiCorpo. Thus, the trial court's sentence of *de facto* life for defendants is in conflict with its determination that a life sentence was not warranted.

¶ 55    Finding error, we remand for resentencing before a different trial judge. See Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (a reviewing court may "enter any judgment and make any order *** and grant any relief *** that the case may require"); R. 615(b)(2) (a reviewing court may "modify any or all of the proceedings subsequent to *** the judgment or order from which the

- 11 -

appeal is taken"); *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002) (the "authority" under Rule 366(a)(5) "includes the power to reassign a matter to a new judge on remand"); *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45 (justice is better served by remanding to a different trial judge under Rule 366(a)(5) when the trial judge "gave lip service to the standard it was supposed to apply"). The trial judge here repeatedly expressed frustration in having to accept these 17-year-old defendants as juvenile offenders. She observed that Henney was "40 days away from turning 18" and DiCorpo was 93 days "away from turning 18" and that, "but for those few days," defendants "would have been considered adults" and "we would not be sitting here." The court stated that "all of us know" adults "who don't use the best judgment" while "we know some very mature young people." The court found that defendants "were closer to being legally adults than they were children in my opinion. But, nonetheless, *** the Supreme Court has told me that someone under 18 is still a child."

¶ 56    In arguing against the appointment of a different judge, the State relies primarily on *People v. Burnett*, 2016 IL App (1st) 141033. However, that case is inapposite. In *Burnett*, the judge in question was the original trial judge, who had presided over all the proceedings, from jury selection and pretrial motions through a jury trial. See *Burnett*, 2016 IL App (1st) 141033, ¶ 44. On remand, the ultimate finding in *Burnett* was to be made by a jury not the judge. *Burnett*, 2016 IL App (1st) 141033, ¶ 52. By contrast, in the case at bar, the judge below did not preside over the trials and had no particular expertise with this case, other than what was presented at the sentencing itself, and the judge is the one who will make the findings on remand, not a jury.

¶ 57    We do not mean to impugn the abilities or conscientiousness of the judge below. Rather we are aware that the law regarding juvenile sentencing has been a rapidly evolving area of the law, and the court below did not have the benefit of our supreme court's more recent cases in this area such as *Buffer* and *People v. Harris*, 2018 IL 121932, and our own recent cases, such as *Peacock*, *Figueroa*, *Mahomes*, and a long line of other similar cases. Exercising our discretion to remand to a different judge "remove[s] any suggestion of unfairness" from the new sentencing. *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002) (remanding for resentencing before a different judge removes any suggestion of unfairness).

¶ 58    We observe that defendant Henney originally filed his *pro se* postconviction petition concerning his sentence on July 16, 2003, and it is now more than 17 years later. At oral argument before this court, his counsel argued that, if the trial court on remand imposes a 40-year cumulative sentence, to be served with eligibility for day-for-day good-time credit, the sentence will have already run prior to resentencing. Thus, we order the trial court and the parties to hold a resentencing hearing speedily.

¶ 59    Although both defendants asked this court at oral argument to consider imposing 40-year aggregate sentences instead of remanding for resentencing, neither defendant asked for this relief in their appellate briefs. As a result, this issue remains unbriefed. We decline to exercise our discretion under Rule 615(b) to impose 40-year aggregate sentences, where we lack relevant and current information, such as defendants' current IDOC records and current projected release dates. The last sentencing hearing concluded over three years ago, and thus, the information in our appellate record is three years out of date.

¶ 60                                    CONCLUSION

¶ 61        For the foregoing reasons, we reverse and remand with directions to conduct a resentencing hearing promptly before a different circuit court judge. We encourage the judge to look closely at *Buffer*.

¶ 62        Reversed and remanded with directions.