2021 IL App (1st) 170649-U

THIRD DIVISION
December 8, 2021

No. 1-17-0649

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee | ) ) | Cook County |
| v. | ) ) | Case No. 02 CR 11110 |
| CHARLES GRIFFIN, | ) ) ) | Honorable Nicholas Ford |
| Defendant-Appellant | ) ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justice McBride concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1    *Held*: Vacated and remanded. Defendant's 66-year sentence for crime he committed while 17 years old is unconstitutional as applied to him, as sentencing scheme did not permit court discretion to sentence him to anything other than *de facto* life sentence.

¶ 2    In 2001, when he was 17 years old, Charles Griffin agreed to drive two men to a drug house so they could rob it. While he parked in a nearby alley, the men went in, shot and killed three people, and took some drugs before Griffin sped them away. The shooters were never caught, but Griffin was, on an unrelated matter. Voluntarily, he confessed to his role, and a jury convicted him of, among other things, three counts of murder based on accountability for aiding

and abetting the shooters. Following the law as it existed at the time, the court sentenced Griffin to remain in prison for the rest of his natural life with no chance of parole or release.

¶ 3     About a decade later, his mandatory natural life sentence was set aside on collateral appeal after the U.S. Supreme Court, in *Miller v. Alabama*, 567 U.S. 460 (2012), held that the eighth amendment forbade mandatory life without parole sentences for juvenile defendants. Following an extensive hearing, the circuit court re-sentenced defendant to 22 years in prison for each murder. By law, each sentence had to run consecutive to the other, for a total of 66 years.

¶ 4     Like many others before him, Griffin is now caught between how *Miller* and its progeny have interpreted the eighth amendment and a sentencing scheme that, through a series of triggering conditions, mandates he serve what he claims is a *de facto* life sentence for crimes he committed as a juvenile. On appeal, among other things, he claims his 66-year sentence violates the U.S. Constitution's eighth amendment.

¶ 5     We agree. When it re-sentenced him in 2017, the circuit court did not have the full aid of a fast-developing body of law, and the law did not allow the court to sentence defendant to less than 60 years in prison. We now know that, in Illinois, any sentence more than 40 years is a *de facto* life sentence and cannot stand unless the court found Griffin permanently incorrigible. But the court's comments at sentencing suggest it did not believe he was beyond rehabilitation and intended to give him a chance at being released. Because the court had no choice but to sentence defendant to what is now defined as a *de facto* life sentence, and without a finding the defendant was not beyond rehabilitation, defendant must be re-sentenced. We vacate his sentence and remand this cause for a new sentencing hearing, with instructions.

¶ 6                                    BACKGROUND

¶ 7     In the evening of August 17, 2001, Margaret Bracy went to bed at her home on South

Church Street in Chicago, where she lived with her daughter, Khristian, and her mother, Ethel. That night, Khristian's boyfriend, Terrell Hall, and her friend, Nadia James, were at the house, hanging out with Khristian. Sometime around 2 a.m., Nadia burst into Margaret's room and hid behind the door. Khristian followed right behind. Margaret asked Khristian what was wrong, but Khristian told her everything was alright and to go back to bed. Both girls then left Margaret in her bedroom and went upstairs. Margaret followed them.

¶ 8    When she got upstairs, Margaret found Khristian's bedroom door was locked. She heard a strange man's voice say "we're gonna let you in," and someone opened the door. Margaret saw Khristian, Terrell, and Nadia, as well as two men she didn't recognize. The men were dressed in all black, their faces covered, and one held a long silver gun. One of the men ordered everyone to the ground. When Margaret, Khristian, Terrell and Nadia were on the floor, the man with the gun pointed it at Khristian and shot her multiple times. The man then turned the gun on Terrell and Nadia, shooting them both. One man asked the other if they had "got everything" before both men fled the house. Margaret then called 9-1-1.

¶ 9    Chicago police officers Richard Maxwell and Patrick O'Malley responded. When they arrived, Margaret and Ethel met them at the door, crying and screaming. The officers went into the house and up to the second-floor bedroom, where they saw a pair of legs sticking out from one of the beds and two other bodies lying face down on the ground. All three bodies laid in large pools of blood, dead from gunshot wounds. Police searched the house and scene and found things used to sell drugs, including a small scale and small bags that are used to weigh and prepare them for sale. Police also found a fake can of soda with a hidden compartment; inside were 40 bags of crack cocaine. The medical examiner concluded Terrell and Nadia both died from being shot in the head. Khristian was shot multiple times and died from her injuries.

¶ 10    Later, acting on a tip from Melvin Phillips, police recovered a .357 caliber handgun from the 6300 block of South Bishop Street in Chicago. An Illinois State Police forensic scientist later determined that gun fired two bullets retrieved from the victims, as well as a bullet found on the floor of the house.

¶ 11    The case went cold until late February 2002. That month, police arrested Griffin, the defendant here, on an unrelated matter. Defendant offered to tell police about a robbery and triple homicide he knew about, and on February 27, 2002, Detective Karen Morrissette and her partner interviewed him at the Area 2 police station.

¶ 12    In his first interview, defendant told Morrissette that a man named Shabaz told him he had invaded a home with his cousin, Little Chris, and killed three people. Shabaz (whose real name is Gerard Hampton) said he shot the victims because they recognized him from when he used to buy drugs from that house. Phillips then told defendant to take the gun Shabaz used and put it behind a house at 62nd and Bishop. Defendant got the gun, wiped his prints from it, and gave it to a woman who put it behind the house.

¶ 13    Morrissette did not think defendant had been fully forthcoming, so she interviewed him again a few hours later. Morrissette began that interview by asking defendant if he had been involved in the murders. Defendant said he did not kill anyone, but admitted he knew about them because he had gone with Shabaz and Little Chris to the house to rob it. A week before the murders, Shabaz asked him if he wanted to help rob a drug house. Defendant, 17 years old at the time of the murders, agreed to help. The following week, Shabaz asked defendant if he was ready, and defendant said he was. Shabaz picked defendant up in a brown Chrysler, and defendant took over driving. They picked up a man named Little Chris, Shabaz's cousin. After picking up Little Chris, defendant drove the two men to an alley at 113th and South Church

streets, where Shabaz told defendant to park in the alley and wait in the car.

¶ 14     Shabaz and Little Chris got out and walked to the front of Church Street, out of defendant's sight. They were gone for about 15 minutes, during which Griffith heard five or six gunshots. Shabaz came back to the car with a .357 revolver in one hand and a bag of marijuana in the other and told Griffin to drive away. In the car, Little Chris asked Shabaz why he shot the man and woman in the house; Shabaz said he knew them. Shabaz, meanwhile, was upset at Little Chris for not grabbing a large container of drugs, which was the reason they went to the house in the first place. Griffin drove back to 63th and South Bishop streets, and everyone went their separate ways. Two days later, he saw Shabaz, who asked Griffin why he had not yet picked up his share of the robbery. Griffin told him he did not want it.

¶ 15     After the interview with Morrissette, Griffin spoke with an assistant State's attorney, who interviewed Griffin again and wrote out his version of events. Griffin told the ASA generally the same story, but with some added details. Griffin again said Shabaz asked him to drive Shabaz and Little Chris to the drug house to rob it, and while the two men went in, Griffin would be the lookout. Griffin said he drove both men to the house, and when Shabaz got out of the car, he had a .357 revolver in his hand. Griffin waited for about 10 to 15 minutes in the car and heard about four gunshots before Shabaz and Little Chris came back to the car. Shabaz still had the gun but also had a large bag of cannabis. When the men got into the car, Griffin sped away and drove back to 63rd and Bishop. Little Chris asked Shabaz why he had shot the victims, and Shabaz said it was because she could identify him.

¶ 16     The State charged Griffin with multiple crimes including murder, home invasion, and robbery. While awaiting trial in this matter, defendant pleaded guilty in five separate cases to various charges of armed robbery and attempted armed robbery, all with a firearm, for crimes

committed after the murders but before he turned 18 years old and was arrested. The court sentenced defendant to 14 years in prison in each case and ordered the sentences to run concurrently.

¶ 17    Defendant also was charged with possession of contraband in a penal institution while in custody awaiting trial; he later pleaded guilty to that charge and received a sentence of 4 years in prison, with that sentence to run consecutive to the 14-year sentence in the robbery case and any sentence resulting from the murder charges.

¶ 18    In 2004 and after a trial, a jury found defendant guilty of, among other things, three counts of first-degree murder—one count each for Bracy, Hall, and James. The trial court, observing the law gave it no other choice, sentenced defendant to natural life in prison under the Illinois multiple-murder statute. The court did so after noting that the sentence was "harsh, maybe unfair" and might be "excessive in view of [defendant's] participation," but ultimately concluded that it was "not the place of the court to make those decisions" given the mandatory sentence set by statute.

¶ 19    We affirmed his conviction and sentence on appeal. *People v. Griffin*, 368 Ill. App. 3d 369 (2006). In doing so, we rejected his claim that the multiple-murder sentencing statute, as it applied to him, violated the proportionate penalties clause of our state constitution. *Id.* at 380.

¶ 20    Defendant filed a postconviction petition in 2007 that was dismissed as frivolous and patently without merit. We granted appellate counsel's motion to withdraw from the appeal of the petition's dismissal and affirmed. *People v. Griffin*, 1-08-1589 (June 30, 2009) (unpublished order under Supreme Court Rule 23).

¶ 21    In June of 2013, defendant sought leave to file a successive postconviction petition. Relying on *Miller*, he claimed his natural life sentence violated the eighth amendment. He also

raised another proportionate penalties challenge. The court granted leave and advanced the petition to the second stage. Defendant was appointed counsel, and the parties proceeded to hold a new sentencing hearing.

¶ 22    Before the new sentencing hearing, both parties filed extensive sentencing memoranda. In it, defendant asked the court to consider the numerous certificates he had earned while in prison, as well as letters from former teachers and friends. He argued the court should not impose consecutive sentences and, relying on *People v. Reyes*, 2016 IL 119271, suggested a sentence of 32 years would be appropriate. The State, meanwhile, argued that an extended term-of-years was appropriate. The State also contended that the law required the sentences on each individual murder count to run consecutive to each other, meaning the defendant faced a minimum sentence of 60 years.

¶ 23    After both parties argued in favor of their respective positions, the court sentenced defendant to 66 years in prison: 22 years on each count of murder, each count's sentence running consecutive to the others. In doing so, the court highlighted that, while the defendant did not enter the house and shoot the victims, he was accountable for those who were. It was not "outrageously unforeseeable" that people could die when their home was invaded and robbed, the court said. And while the court said it did not believe natural life was an "inappropriate sentence" in the case, it admitted the mitigation had an effect on the court. Importantly, the court said that, in its view, "the Defendant must be sentenced to a sentence on each murder separately, and they must be consecutive to one another." The court also ordered defendant to serve his 14-year armed robbery sentence, as well as the 4-year sentence for possession of contraband in a penal institution, consecutively to each other and the murder sentences. Total, the sentence would add up to 84 years, not counting any sentencing credit.

¶ 24    After giving the defendant admonishments on how to appeal his sentence, the court said: "This is not a life sentence. This is a sentence that will allow his release at an older age, but there is a release out there. I wish you good luck, Mr. Griffin." Defendant filed a motion to reconsider, arguing the consecutive sentence mandate basically left defendant in the same place he was to begin with—facing the equivalent of a life sentence. The court denied the motion, saying only there was a "substantial reduction" in defendant's sentence. Defendant timely appealed.

¶ 25                                   ANALYSIS

¶ 26                                  I. Jurisdiction

¶ 27    First, we need to ensure our jurisdiction, though neither party has questioned it. The circuit court never formally entered an order—oral or written—granting defendant's successive postconviction petition and vacating his prior natural life sentence. On October 4, 2013, the court advanced the successive petition to the second stage of postconviction proceedings. Moving a petition to the second stage is not the same as granting it. *See People v. Beaman*, 229 Ill. 2d 56, 71-72 (2008) (discussing three separate postconviction stages). On the later dates, the parties seemed to agree that defendant needed to be re-sentenced. But the court never granted the postconviction petition nor vacated the 2003 judgment imposing a natural life sentence.

¶ 28    Absent such an order, the circuit court arguably lacked subject-matter jurisdiction to re-sentence defendant, since the circuit court lost jurisdiction to do so 30 days after denying defendant's original motion to reconsider his sentence in 2004. *See People v. Bailey*, 2014 IL 115459, ¶ 14; *People v. Lake*, 2020 IL App (1st) 170309, ¶ 14. Filing a postconviction petition does not vest the court with jurisdiction to change a sentence without first granting the petition, since postconviction proceedings are not part of the criminal process and are instead collateral civil proceedings. *People v. Hill*, 202 IL App (1st) 171739, ¶ 23. And if the court did not have

jurisdiction to enter the order from which defendant now appeals, we lack jurisdiction, too, other than to vacate the circuit court's void judgment and dismiss the appeal. *See Bailey*, 2014 IL 115459, ¶ 29.

¶ 29    But we find that the court had jurisdiction under the revestment doctrine. For the doctrine to apply, both parties must 1) actively participate in the proceedings; 2) fail to object to the untimeliness of the late filing; and 3) assert positions that make the proceedings inconsistent with the prior judgment. *Id.* ¶ 26. A nearly identical situation happened in *Hill*, 2020 IL App (1st) 171739, ¶¶ 26-28, and we follow its lead.

¶ 30    Here, it is clear that the court was intending to supplant the 2003 sentence with its new one. Though it did not formally grant the postconviction petition, it effectively did so by its action. Each party agreed that the original life sentence could no longer stand per *Miller*, each party filed and argued sentencing memoranda, and nobody raised any objection to the fact that an attack on the sentence was taking place 9 years after the original sentence. (In *Hill*, 2020 IL App (1st) 171739, ¶ 27, an even longer period of time, nineteen years, had elapsed.)

¶ 31    In sum, all parties acted with eyes wide open to the fact that a re-sentencing was mandated by *Miller*, and it would be pointless to exalt form over substance and pretend otherwise. The court was revested with jurisdiction, as in *Hill*, and we thus have jurisdiction to review its order.

¶ 32                                  II. *Miller* and Illinois

¶ 33    Because much has changed in juvenile sentencing since defendant was first sentenced— and continues to change even now—a brief survey of the law as it exists today is a good place to begin. In *Miller*, the U.S. Supreme Court held that the eighth amendment forbids a sentencing scheme which results in a mandatory life in prison without parole sentence for a juvenile

offender. *Miller*, 567 U.S. at 479. Mandatory-life sentencing schemes run afoul of the constitution because they rob a factfinder of the ability to consider youth—including children's diminished culpability and heightened capacity for change—before imposing the harshest penalty possible. *Id.* The court applied *Miller* retroactively in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016).

¶ 34 Using *Miller* and *Montgomery* as a springboard, our state supreme court has added its own interpretations as well. In *People v. Reyes*, 2016 IL 119271, ¶ 9, the court held that "sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole" violates the eighth amendment. The practical effect of a mandatory term-of-years sentence that cannot be served in one lifetime and that of a mandatory life sentence is the same, the court said; either way, the juvenile will die in prison. *Id.* Thus, a sentence that is a mandatory term of years that will ensure a juvenile defendant will never be released is the same as a mandatory, non-probationable life sentence for *Miller's* purposes. *Id.*

¶ 35 The court made some of its most extensive analysis of *Miller*, as it should be applied in Illinois, in *People v. Holman*, 2017 IL 120655. There, the court held that, under *Miller* and *Montgomery*, a court may sentence a juvenile to life in prison without parole, "but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics." *Id.* ¶ 46. Thus, a finding of permanent incorrigibility was necessary to any life sentence. (That holding in *Holman* remains the law in Illinois as of now, though recent U.S. Supreme Court precedent may one day change that; we will have more to say on that herein.)

¶ 36 Our supreme court then settled one of the thorniest questions: what constitutes a *de facto*

life sentence in prison? In *People v. Buffer,* 2019 IL 122327, ¶ 40, finding inspiration in amendments to a juvenile-justice law the General Assembly passed, the court held that any prison sentence for a juvenile defendant that is more than 40 years is legally a *de facto* life sentence in Illinois. Lastly, in *People v. Dorsey*, 2021 IL 123010, ¶ 64, the court held that the defendant's eligibility for good-conduct credit, in which he could earn time off a sentence by demonstrating maturity and rehabilitation, matters when calculating a sentence's true length for *Miller*'s and *Buffer*'s purposes.

¶ 37                                III. This defendant's sentence

¶ 38    The table set, we turn to defendant's claim. Relying on the line of cases from *Miller* to *Buffer*, Griffin claims his 66-year sentence is unconstitutional because it violates the eighth amendment of the U.S. Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause (Ill. Const. 1970, art. I, § 11) of our state constitution. The fix, he says, is to declare both the consecutive-sentence mandate for murder (730 ILCS 5/5-8-4(d) (West 2016)) and the truth-in-sentencing statute requiring him to serve 100 percent of that sentence (730 ILCS 5/3-6-3(a)(2)(i) (West 2016)) unconstitutional as applied to him, then remand for re-sentencing.

¶ 39    First, we must determine if there is anything constitutionally offensive with his current sentence. The defendant must show his sentence is 1) a life sentence, mandatory or discretionary, natural or *de facto*; and 2) imposed without consideration of the defendant's youth and its attendant characteristics. *Buffer*, 2019 IL 122327, ¶ 27. As noted above, for now, at least, under *Holman*, 2017 IL 120655, ¶ 46, a juvenile defendant may only be sentenced to life imprisonment without parole if the trial court determines that the defendant is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation. Failure to comply with *Miller* must be shown; it is never presumed. *People v. Chambers*, 2021 IL App

(4th) 190151, ¶ 65. Our review is *de novo*. *Holman*, 2017 IL 120655, ¶ 23.

¶ 40        A. Defendant was subject to a mandatory *de facto* life sentence

¶ 41    We start with the sentencing scheme defendant faced at re-sentencing. To comply with *Miller*, the General Assembly removed 17-year-olds from the corrections code's multiple-murder natural-life sentence mandate in 2016, after defendant had first been sentenced. *See* 730 ILCS 5/5-8-1 (West 2016). This time around, the law no longer required the court to sentence defendant to natural life. But defendant says it ultimately doesn't matter; the difference between the sentencing scheme that first applied to him and the scheme that applied at his re-sentencing was, for all intents and purposes, the same.

¶ 42    The cause, he says, is twofold. First, section 5-8-4(d)(1) of the Uniform Code of Corrections mandates that each murder sentence run consecutive to the other. Second, because murder does not entitle him to any good-conduct credit under Illinois's Truth-in-Sentencing statute, he must serve 100 percent of any sentence he's given. Since defendant was convicted of three separate murder charges, and the minimum sentence for murder is 20 years, the minimum he could be sentenced to is 60 years in prison—a *de facto* life sentence, per *Buffer*.

¶ 43    First-degree murder carries with it a base sentencing range of 20 to 60 years, without any applicable enhancements. 730 ILCS 5/5-4.5-20 (West 2016). But a first-degree murder conviction also triggers Section 5-8-4(d)(1) of the Unified Code of Corrections, which mandates consecutive sentences on all other independent charges to which defendant is sentenced. 730 ILCS 5/5-8-4(d)(1) (West 2016). In other words, the sentence on a consecutive-triggering offense must be served prior to and independent of any other sentence. *People v. Curry,* 178 Ill. 2d 509, 539 (1997), *abrogated on other grounds by People v. Hale*, 2013 IL 113140. Because defendant cannot receive any good-time credit off his murder sentence, 730 ILCS 5/5-3-6-

3(a)(2)(i) (West 2016), he must serve every day sentenced.

¶ 44    So defendant is correct: under the law that applied to him at re-sentencing, he could not receive anything less than a sentence of 60 years—20 years per count of murder, each of which must run consecutively to the others. Boxed in, even if the court could consider defendant's youth and its attendant characteristics, it could not give him any relief; sixty years was the minimum aggregate sentence. And that is obviously a problem, as *Miller* forbids "a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders" (*Miller*, 567 U.S. at 479), which in Illinois means any sentence greater than 40 years. *Buffer*, 2019 IL 122327, ¶ 29.

¶ 45    For a juvenile defendant in Illinois, there is no difference in the eyes of the law between a 60-year sentence and a natural-life sentence. Since the statutory scheme gave the court no discretion to sentence defendant to anything other than a *de facto* natural life sentence, the sentencing scheme, as applied to this defendant, conflicts with *Buffer* and *Miller* and violates the eighth amendment. (And thus so do the *actual* consecutive sentences imposed, which were just over the minimum, a total of 66 years for the three murders.)

¶ 46    Surprisingly, the State tells us we should not consider the three consecutive murder sentences in the aggregate but, rather, should isolate each of the sentences individually. In other words, each 22-year sentence is constitutional, because each one is under 40 years, notwithstanding that it would result in 66 years of incarceration in total. We say we are surprised by this argument because it is plainly wrong under supreme court precedent.

¶ 47    In *People v. Reyes*, 2016 IL 119271, ¶ 10, our supreme court aggregated defendant's three mandatory consecutive sentences (45 years for murder plus two sentences of 26 years for two attempted murders) in determining that defendant's total sentence of 97 years was a *de facto*

- 13 -

life sentence. Likewise, in *Dorsey,* 2021 IL 123010, ¶ 51, the court considered the "aggregate term" of 76 years (40 for murder, plus two 18-year sentences for attempted murder, all running consecutively) in determining whether defendant was serving a *de facto* life sentence. There is thus no question that here, we consider defendant's 66-year prison term in the aggregate.

¶ 48 Which only makes sense. The lesson of *Reyes*, *Holman*, and *Buffer* is that a court may not give up on juveniles, locking them up for life or the functional equivalent of life, unless it first finds that the juvenile is one of those rare ones incapable of rehabilitation. *Holman*, 2017 IL 120655, ¶ 46; *People v. Ruiz*, 2021 IL App (1st) 182401, ¶ 61. That principle does not split hairs over how that sentence was constructed or which sentencing mechanism(s) prompted that life sentence. A juvenile is in prison for life all the same if it was one or more than one sentence that put him there.

¶ 49 So to answer *Buffer's* first question, we look at how long it will be until the defendant could be released. Thanks to *Reyes* and *Dorsey*, we know how to do the math. First, calculate the aggregated term. *Reyes*, 2016 IL 119271, ¶ 10; *Dorsey*, 2021 IL 123010, ¶ 50. Then, subtract the potential good-conduct credit. *Reyes*, 2016 IL 119271, ¶ 10, *Dorsey*, 2021 IL 123010, ¶ 49. If the result is more than 40 years, it's a *de facto* life sentence and it triggers *Miller* protections. If not, the challenge fails, and our task is done. *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 35, 38.

¶ 50 Here, defendant's earliest possible release is after 66 years, since there is no good-conduct credit for his murder convictions, and he must serve 100 percent of the time. 730 ILCS 5/3-6-3 *et seq* (West 2016). Defendant's 66-year sentence thus constitutes a *de facto* life sentence for the purposes of the eighth amendment. *Buffer*, 2019 IL 122327, ¶ 40.

¶ 51 B. The court did not find defendant permanently incorrigible

¶ 52 As noted, a juvenile *may* be sentenced to life in prison, just not mandatorily per statute;

- 14 -

before doing so, the court must consider the *Miller* factors and determine whether the defendant was among those juveniles whose conduct reflects transient immaturity, or if he is among the rarest of juvenile offenders whose conduct places him beyond the possibility of rehabilitation. *Holman*, 2017 IL 120655, ¶ 46. While there are no "magic words" the trial court need utter to find defendant permanently incorrigible (*Ruiz*, 2021 IL App (1st) 182401, ¶ 74), the court must make findings that indicate that defendant is one of the rare juvenile offenders who is beyond rehabilitation. *Hill*, 2020 IL App (1st) 171739, ¶ 50.

¶ 53    We should pause here to note that this law continues to evolve even now. After briefing was completed in this case, the U.S. Supreme Court released *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S.Ct. 1307, 1323 (2021), where the Court held that *Miller* and the eighth amendment do *not* require a trial court to make a finding of permanent incorrigibility before imposing a life sentence on a juvenile. Instead, *Miller* only requires a "discretionary sentencing procedure." *Id.*, 141 S.Ct. at 1323. The Court emphasized, however, that states are free to impose additional sentence limits or require specific factual findings before sentencing a juvenile to life without parole. *Id.*

¶ 54    Where that will ultimately leave *Holman*, which read *Miller* as *requiring* a finding of permanent incorrigibility before a juvenile life sentence could be imposed, is unclear—as even our supreme court recognized in *Dorsey*, 2021 IL 123010, ¶ 42 (*Holman*'s holding "is questionable in light of *Jones*."). For us, however, *Holman* is the law until our supreme court says otherwise. See *People v. Fountain*, 2012 IL App (3d) 090558, ¶ 23 (appellate court bound by supreme court's interpretation of federal law); *Mekertichian v. Mercedes-Benz U.S.A., Inc.*, 347 Ill. App. 3d 828, 836 (2004) ("As an inferior court of review, our serving as a reviewing

court on our supreme court's interpretation of federal law would inject chaos into the judicial process.").

¶ 55    So with that note aside, current law in Illinois still requires, as a precondition to imposing a *de facto* life sentence, that the court consider a defendant's youth and its attendant characteristics and then determine that his conduct shows irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. *Buffer*, 2019 IL 122327, ¶ 27; *Holman*, 2017 IL 120655, ¶ 46.

¶ 56    The State says the trial court did just that—it conducted a comprehensive sentencing hearing and concluded the defendant was incorrigible. We see it differently.

¶ 57    When defendant was first sentenced in 2001, his sentencing hearing was little more than performative; the outcome (mandatory natural life in prison) had already been written. The original sentencing judge noted his lack of discretion, after making it clear that he found a sentence of natural life to be harsh and possibly excessive in light of defendant's limited participation in the crime.

¶ 58    At the re-sentencing hearing years later that is under review here, defendant presented extensive mitigating evidence, while the State offered substantial evidence and argument in aggravation. We agree that defendant was given a comprehensive re-sentencing hearing, and the court had an opportunity to consider his youth and its attendant characteristics. But we do not agree that the court found defendant permanently incorrigible.

¶ 59    Most importantly, the trial court never uttered those words or anything close to them. No mention of permanent incorrigibility or irreparable corruption or lack of rehabilitative potential or anything of the sort. That may well owe to the fact that our supreme court's decision in

*Holman* had not yet come down, and the trial court did not think it *needed* to make such a finding before imposing a *de facto* life sentence.

¶ 60    More likely, the court made no such finding because the trial court didn't think it was *imposing* a life sentence. After all, our supreme court's decision in *Buffer*, which demarcated a 40-year bright line, had not yet come down. And the trial court made clear that it did not believe the sentence it was imposing would imprison defendant forever: "This is not a life sentence. This is a sentence that will allow his release at an older age, but there is a release out there."

¶ 61    Regardless of the reason why, the court never made a finding, one way or the other, about the rehabilitative potential of defendant. The State tries to pluck stray comments from the transcript, but we are not convinced. True, the court found its sentence "woefully inadequate to reflect the seriousness of the offense" and noted that a life sentence would not be "inappropriate," while emphasizing the gravity of three young victims' lives being lost. But that did not stop the trial court from imposing the sentence it did—only two years above the minimum for each of the three murders, what the court itself later deemed a "substantial reduction" owed in part to the mitigating evidence it heard. A substantial reduction for someone the court considered beyond redemption?

¶ 62    The court could have imposed three consecutive 60-year sentences. Indeed, the fact that defendant received barely more than the minimum for each sentence, *notwithstanding* the gravity of the crime, would suggest, if anything, that the court heavily considered defendant's youth and rehabilitative potential.

¶ 63    But we do not come down conclusively on either side. It is clear to us that, while we could glean hints in the transcript here or there, the trial court did not believe it was expected to make a finding about defendant's rehabilitative potential, and the court did not do so. Lacking a

clear finding that the defendant is beyond rehabilitation, we decline to read one into the record. *Luna*, 2020 IL App (2d) 121216-B, ¶ 27.

¶ 64    We cannot fault the trial judge, who conducted the re-sentencing hearing before *Buffer* told him that a sentence of over 40 years was a *de facto* life sentence, and before *Holman* told him that he had to make a finding of permanent incorrigibility before imposing such a sentence. Regardless, that is where we find the matter—a sentence of *de facto* life imprisonment was imposed without a finding first that defendant was beyond rehabilitation. See *DiCorpo*, 2020 IL App (1st) 172082, ¶ 52; *Reyes*, 2020 IL App (2d) 180237, ¶ 32. Under existing law, that sentence violates the eighth amendment and must be vacated. In light of this disposition, we need not consider defendant's argument regarding the proportionate penalties clause.

¶ 65                        IV. Instructions upon re-sentencing

¶ 66    On remand, defendant must, of course, be re-sentenced. But we are reluctant to give too much guidance to the trial court based on the record and the appeal before us, given the rapid fluctuation in eighth-amendment jurisprudence, and given that some interval of time will pass before this case goes to re-sentencing.

¶ 67    For example, we have just vacated defendant's sentence because it was a *de facto* life sentence and, under *Holman*, the trial court cannot impose such a sentence unless it first makes a finding of permanent incorrigibility. That is clearly the law *today*. But will it be by the time defendant is re-sentenced? Our supreme court has not hidden the fact that its holding in *Holman* is "questionable" in light of more recent decisions from the U.S. Supreme Court. *Dorsey*, 2021 IL 123010, ¶ 42. The parties and the trial court will need to be attuned to the most recent pronouncement from our supreme court on that question.

¶ 68    We would also note the law passed in 2019 in Illinois, which mandates a parole hearing

after 20 years for juveniles convicted of murder in most circumstances. See 730 ILCS 5/5-4.5-115(b) (West 2020). Does that statute apply to defendant on re-sentencing? At first blush, it appears to, but we will not definitively answer that question, as it is not before us and has not been briefed. Nor has this question: If, in fact, defendant is eligible for a parole hearing after 20 years, does that parole hearing constitute a meaningful opportunity for release and thus comply with *Miller*, 567 U.S. 460, even if the sentence is otherwise a *de facto* life sentence? See *People v. Beck*, 2021 IL App (5th) 200252, ¶¶ 21-26 (new juvenile-parole statute provides meaningful opportunity for release, thus satisfying eighth amendment even if sentence for juvenile is more than 40 years).

¶ 69   The parties and the court, on re-sentencing, will need to answer these questions, based on prevailing law at that time, before a constitutional sentence can be imposed. To say more than that, at this juncture, would not only put us in a position of opining on matters not before us but, more importantly, would run the risk that we will say something today that may not be true tomorrow.

¶ 70                                CONCLUSION

¶ 71   The judgment of the circuit court is vacated. The cause is remanded for re-sentencing consistent with this opinion.

¶ 72   Vacated and remanded.

¶ 73   Presiding Justice Gordon, specially concurring:

¶ 74   I concur that this case should be remanded for resentencing, but only for the reasons stated below.

¶ 75   Before I discuss my reasons, I must correct some misimpressions that may have been created by the majority order.  First, as I explain below, this was both a discretionary sentence

and a sentence that the trial court imposed with *Miller* and its progeny in mind.

¶ 76     In the case at bar, the 17-year-old defendant was convicted and sentenced originally to natural life in prison. However, he filed a postconviction petition claiming that his mandatory life sentence was unconstitutional pursuant to *Miller* and its progeny, and the trial court agreed. The court granted the petition and held a new sentencing hearing pursuant to *Miller*.

¶ 77     At the resentencing hearing held on January 31, 2017, the trial court had the benefit of *Miller* and all the *Miller* progeny up to that date—although, obviously, not the benefit of any precedent decided in the last four years, such as *Buffer* and *Holman*, which were both decided after defendant's resentencing.[1]

¶ 78     The trial court chose to exercise its discretion to sentence defendant to a total of 66 years, or six years above the mandatory minimum, for three first-degree murder convictions under an accountability theory. In light of the trial court's exercise of discretion in sentencing defendant to a higher sentence, the resulting 66-year sentence was not a mandatory sentence but a discretionary one.

¶ 79     Although discretionary, it was imposed based on what we now know to be an erroneous premise. Regarding the 66-year sentence that it had just imposed, the trial court stated: "This is not a life sentence. This is a sentence that will allow his release at an older age, but there is a release out there." Two years after the trial court made that statement, the Illinois Supreme Court found that sentences of more than 40 years, imposed upon juveniles such as defendant, are, in fact, life sentences. *Buffer*, 2019 IL 122327, ¶ 40. For this reason, a remand and resentencing

---

[1] Although defendant's resentencing was held in 2017, which was the same year that *Holman* was decided, *Holman* was decided on September 21, 2017, which was eight months after the resentencing in this case. *Holman*, 2017 IL 120655. *Buffer* was decided on April 18, 2019. *Buffer*, 2019 IL 122327.

are required.

¶ 80    Second, the proportionate penalties clause was argued in the court below and must be considered separately.  The majority's order conflates the eighth amendment with the proportionate penalties clause to determine whether the sentence is "constitutional."  Respectfully, I also believe the order fails to consider the full impact of *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307 (2021), on the case before us.

¶ 81    The Illinois Supreme Court decided both *Buffer* and *Holman* exclusively under the eighth amendment.  However, the United States Supreme Court case of *Jones* calls into question the continued vitality of these two cases, at least in federal eighth-amendment jurisprudence.  If we are going to continue to apply these two cases, then we need to explain what justifies our doing that.  The majority's order acknowledges the problem but sidesteps it by saying we must apply these cases until our own supreme court tells us not to.  *Supra* ¶ 54. Although I agree with that statement, our supreme court depends on us, its appellate courts, to refine and analyze issues prior to the supreme court's ultimate resolution   Review by a multitude of panels clarifes the issues, like many hands burnishing a coin.  Thus, I explain below what *Jones* stands for, how it applies to *Buffer* and *Holman*, and the impact that these two cases continue to have on our state's jurisprudence.

¶ 82    As noted, in the case at bar, defendant received a discretionary 66-year sentence.  *Supra* ¶¶ 22-23.  The *Jones* Court found that, under the eighth amendment, "a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth."  *Jones*, 593 U.S. at __, 141 S. Ct. at 1321.  If that was all the Court wrote, then a discretionary sentence such as defendant's sentence would be beyond the reach of an eighth-amendment challenge, such as the one defendant has made here.

¶ 83    However, the *Jones* Court was careful to carve out exceptions to its blanket statement, finding:  (1) that it did not apply to as-applied claims under the eighth amendment or claims of disproportionality under the eighth amendment; and (2) that it did not preclude states from imposing additional sentencing limits under their own constitutions and statutes.  *Jones*, 593 U.S. at __, 141 S. Ct. at 1322-23.

¶ 84    The latter is particularly important, since this court has repeatedly found that our own state's proportionate penalties clause provides broader protections than the eighth amendment provides.  *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 51 ("the proportionate penalties clause offers a broader path to the same types of relief"); accord *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 40; *People v. Jones*, 2021 IL App (1st) 180996, ¶ 14.  "The purpose of the proportionate penalties clause is to add a limitation beyond those provided by the eighth amendment."  *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35; accord *Glinsey*, 2021 IL App (1st) 191145, ¶ 43; *Jones*, 2021 IL App (1st) 180996, ¶ 15; *Franklin*, 2020 IL App (1st) 171628, ¶ 55.  "Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties and sentences."  *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; accord *Glinsey*, 2021 IL App (1st) 191145, ¶ 43; *Jones*, 2021 IL App (1st) 180996, ¶ 15.

¶ 85    Although our own proportionate penalties clause is broader, the Illinois Supreme Court decided both *Buffer*, 2019 IL 122327, ¶¶ 13, 25, and *Holman*, 2017 IL 120655, ¶¶ 33, 40, 41, exclusively under the eighth amendment, thereby raising the question of their continued vitality in a post-*Jones* world. *People v. Dorsey*, 2021 IL 123010, ¶ 42 (the continued validity of *Holman* in eighth amendment jurisprudence is "questionable in light of *Jones*").  In the case at bar, the majority applied both *Buffer* and *Holman* without discussing whether these cases are still sound

jurisprudence.

¶ 86    First, in *Holman*, the Illinois Supreme Court found that the United States Supreme

Court's eighth-amendment jurisprudence applied to discretionary sentences. Specifically, our

supreme court found that a discretionary life sentence for a juvenile offender "violate[s] the

eighth amendment, unless the trial court considers youth and its attendant characteristics."

*Holman*, 2017 IL 120655, ¶ 40.  The Illinois Supreme Court provided a list of those attendant

characteristics and found that a sentencing court must consider this list or some variant of it, in

order to satisfy the eighth amendment. *Holman*, 2017 IL 120655, ¶¶ 43-46.  By contrast, in

*Jones*, the United States Supreme Court found that a discretionary procedure generally provides

all the safeguards to which a juvenile is entitled under the eighth amendment. *Jones*, 593 U.S. at

__, 141 S. Ct. at 1319.   The United States Supreme Court found that, if a sentencing court had

the discretion to consider youth, then, by necessity, the sentencing court must have considered it,

and no "on-the-record explanation" is "required."  *Jones*, 593 U.S. at __, 141 S. Ct. at 1319-20.

¶ 87    Even though the Illinois Supreme Court decided *Holman* solely under the eighth

amendment, the logic and reasoning by our supreme court in *Holman* also set a floor or

minimum for our own proportionate penalties clause. In other words, if our court understood the

narrower eighth amendment to guarantee these protections, then our own broader clause must

also guarantee them as a minimum or baseline.  Since the guarantees of our own proportionaties

penalty clause do not change when the United States Supreme Court's eighth-amendment

jurisprudence does, *Holman* is still good law under our own Illinois constitution.

¶ 88    Second, in *Buffer*, the Illinois Supreme Court found that, under the eighth amendment, a

life sentence for a juvenile—including a discretionary sentence—was a sentence over 40 years.

*Buffer*, 2019 IL 122327, ¶¶ 25, 41. While making this numerical finding exclusively under the

eighth amendment, our supreme court determined this number based solely on an examination of our own state's recent legislative enactments. *Buffer*, 2019 IL 122327, ¶¶ 34, 37-40. Our supreme court explained that "the entity best suited" to chart a numerical course was the Illinois "General Assembly." *Buffer*, 2019 IL 122327, ¶ 34. The 40-year number was determined, not by an examination of federal laws or laws in the various 50 states, but rather "charted" by our own state legislature. *Buffer*, 2019 IL 122327, ¶ 34. While deciding the case under the eighth amendment (*Buffer*, 2019 IL 122327, ¶ 41), our supreme court also found that "[t]his conclusion accords with Illinois law" (*Buffer*, 2019 IL 122327, ¶ 35). Thus, *Buffer*, like *Holman*, continues to apply to discretionary sentences pursuant to our state's proportionate penalties clause.

¶ 89    While the United States Supreme Court's eighth-amendment jurisprudence is in flux,[2] and since *Jones* casts doubt on the continued vitality of *Buffer* and *Holman* under the federal constitution's eighth amendment, the sentencing claims by a juvenile or a young adult in an Illinois court are better evaluated under our own, broader, proportionate penalties clause. Thus, I find, pursuant to *Buffer* and our own proportionate penalties clause, a resentencing is required due to the trial court's erroneous assumption that 66 years was not a *de facto* life sentence.

¶ 90    However, finding that a remand is necessary is merely the start of the issues before us. We also need to determine what our statutes permit a trial court to do on remand. The majority's order gives the trial court a list of unanswered questions and little statutory guidance. *Supra* ¶¶ 67-69. When it comes to sentencing, a sentencing court needs to start first with our state's sentencing statutes.

---

[2] Justice Sotomayor observed that *Jones* represented "an abrupt break from precedent" and that the "Court is fooling no one" when it writes otherwise. *Jones,* 593 U.S. at __, 141 S. Ct. at 1328 (Sotomayor, J., dissenting). Accord *Jones,* 593 U.S. at __, 141 S. Ct. at 1323 (Thomas, J., specially concurring) ("the majority adopts a strained reading" of prior precedent).

¶ 91    Section 5-4.5-105 of the Unified Code of Corrections (Code) governs the sentencing of juvenile offenders, and it permits a trial court to "sentence the [juvenile] defendant to *any* disposition authorized for the class of the offense of which he or she was found guilty." (Emphasis added.) 730 ILCS 5/5-4.5-105(b) (West 2018).

¶ 92    The "class" of offense of which defendant was found guilty was first-degree murder. 730 ILCS 5/5-4.5-10(a)(1) (West 2018).  Section 5-4.5-10 of the Code sets forth the different classes of offense and provides that first degree murder is its own "separate class of felony."  730 ILCS 5/5-4.5-10(a)(1) (West 2018).  One "disposition authorized for [this] class" of offense is a sentence of "not less than 20 years and not more than 60 years."  730 ILCS 5/5-4.5-25 (West 2018).  Since the juvenile sentencing provision frees a trial court to impose "any" disposition authorized for this "class of offense," the trial court may impose 20-year concurrent sentences in the case at bar. 730 ILCS 5/5-4.5-25 (West 2018).[3]

¶ 93    This interpretation of this provision is consistent with other parts of the Code. "[S]ections of the same statute should be considered so that each section can be construed with every other part or section of the statute to produce a harmonious whole."  *Board of Education of City of Chicago v. Moore*, 2021 IL 125785, ¶ 40.

¶ 94    For murders committed under certain circumstances, subsection (c) of section 5-8-1 of the Code requires natural life in prison (730 ILCS 5/5-8-1(c) (West 2018)), which we now know is more than 40 years for a juvenile. *Buffer*, 2019 IL 122327, ¶ 40.

¶ 95    Section 5-4.5-105, the juvenile sentencing provision, requires "a sentence of not less than 40 years," or life, for some of the circumstances listed in subsection (c) of section 5-8-1—but for

---

[3] But, as I discuss later on pages 10-11, the trial court cannot impose a 40-year or more sentence without first finding that defendant is permanently incorrigible.

not all of them. 730 ILCS 5/5-4.5-105(c) (West 2018).  The legislature required a 40-year minimum sentence for a juvenile if circumstances (iii) through (vii) appeared, but it quite deliberately chose to leave (i) and (ii) off this list. 730 ILCS 5/5-4.5-105(c) (West 2018).  Thus, 40 years is required as a minimum for juveniles who murdered a police officer, a firefighter, a corrections officer, an emergency medical technician or a community policing volunteer.  See 730 ILCS 5/5-8-1(c) (West 2018); *Buffer*, 2019 IL 122327, ¶¶ 37-39.  However, the juvenile sentencing provision, recently enacted by our legislature (730 ILCS 5/5-4.5-105(c) (West 2018)), does not require a 40-year minimum sentence if the juvenile was "(i) ***previously *** convicted of first degree murder" or "(ii) *** found guilty of murdering more than one person." 730 ILCS 5/5-8-1(c) (West 2018).

¶ 96    The legislature's choice to leave multiple murders off its list of mandatory 40-year punishments is consistent with our interpretation that consecutive sentences are not required for multiple victims under the new juvenile sentencing provision.

¶ 97    After finding that our statutes give the trial court the discretion to utilize a sentencing range with a 20-year minimum, the next question is what the maximum is.  As we observed above, the juvenile sentencing provision permits a trial court to impose "any" disposition authorized for this "class of offense" (730 ILCS 5/5-4.5-25 (West 2018)), which includes life. While the juvenile sentencing provision (730 ILCS 5/5-4.5-105(c) (West 2018)) does not require a 40-year minimum sentence if the juvenile was "(i) ***previously *** convicted of first degree murder" or "(ii) *** found guilty of murdering more than one person"  (730 ILCS 5/5-8-1(c) (West 2018)), it does not bar it either.

¶ 98    However, before imposing a more-than-40-year sentence, the trial court must first find that defendant is permanently incorrigible.  As this court has observed numerous times, under

*Holman*, "a juvenile defendant may be sentenced to life or *de facto* life imprisonment, but before doing so, the trial court must 'determine[ ] that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 22 (quoting *Holman*, 2017 IL 120655, ¶ 46); *People v. DiCorpo*, 2020 IL App (1st) 172082, ¶ 54; *People v. Figueroa*, 2020 IL App (1st) 172390, ¶ 24.

¶ 99   In sum, pursuant to our state's proportionate penalties clause, I concur that we must remand for resentencing due to the trial court's incorrect presumption, now in violation of *Buffer*, that defendant's 66-year sentence was not a *de facto* life sentence. On remand, the trial court must carefully consider the statutory guidelines for sentencing juveniles set forth by our legislature in section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2018)), and fashion an appropriate sentence from a sentencing range of 20 years to life. However, it may not sentence defendant to *de facto* life, or more than 40 years, unless it first finds that he is permanently incorrigible.